ORIGINAL

1  SEDGWICK, DETERT, MORAN & ARNOLD LLP
   BRIAN D. HARRISON  Bar No. 157123
2  One Market Plaza
   Steuart Tower, 8th Floor
3  San Francisco, California 94105
   Telephone: (415) 781-7900
4  Facsimile:  (415) 781-2635
   Email: brian. harrison@sdma.com
5

6  Attorneys for Plaintiff
   PHILADELPHIA INDEMNITY INSURANCE COMPANY
7

8

9            UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11               SAN JOSE DIVISION

12  PHILADELPHIA INDEMNITY            CASE NO.  C08  01773
    INSURANCE COMPANY, a
13  Pennsylvania corporation,
                                      COMPLAINT FOR DECLARATORY
14         Plaintiff,                 RELIEF

15         v.                         [JURY DEMAND INDORSED
                                      HEREIN; Fed. R.Civ.P. 38]
16  SALINAS GOLF and COUNTRY
    CLUB, Inc., a California corporation
17  and RUSSELL BAAR, an individual

18         Defendants.

19

20         NOW COMES plaintiff Philadelphia Indemnity Insurance Company

21  ("Philadelphia") and, for its complaint against defendants Salinas Golf and

22  Country Club, Inc. ("Club") and Russell Baar, D.C. ("Baar") alleges as follows:

23                    JURISDICTION AND VENUE

24         1.    Jurisdiction of this action is founded upon 28 U.S.C. § 1332, as the

25  parties are citizens of different states and the amount in controversy exceeds the

26  sum of $75,000, exclusive of interest and costs.

27         2.    Venue is proper in the Northern District of California pursuant to 28

28  U.S.C. §§ 1391(a) and (c) in that the defendants are subject to personal

SEDGWICK
DETERT, MORAN & ARNOLD LLP

SF/1493004v1

1   jurisdiction in this district at the time the action is commenced, the insurance

2   policy at issue was entered into in this district, and a substantial part of the events

3   or omissions giving rise to the claim occurred in this district.

4                                     <u>PARTIES</u>

5        3.     Philadelphia is a corporation organized and incorporated under the

6   laws of the State of Pennsylvania with its principal place of business in Bala

7   Cynwyd, Pennsylvania. At pertinent times, Philadelphia has conducted business

8   in this district.

9        4.     At all times herein relevant, defendant Club was and is a corporation

10   duly organized and incorporated under the laws of the State of California, with its

11   principal place of business in the County of Monterey. At all times herein

12   relevant, a substantial part of the events or omissions giving rise to the claim

13   occurred in this district.

14        5.     On information and belief, Baar is an individual who is a citizen and

15   resident of the State of California, County of Monterey.

16                  <u>PRELIMINARY ALLEGATIONS</u>

17        6.     Philadelphia issued Flexi Plus Five Policy No. PHSD165265 to the

18   Club for the policy period of November 26, 2005 to November 26, 2006 ("the

19   Policy"). The Policy provides coverage pursuant to all the terms, conditions,

20   limitations, exclusions, and endorsements contained therein. A true and correct

21   copy of the Policy is attached hereto as Exhibit A.

22        7.     From November 26, 2004 to November 26, 2005, the Club was

23   insured by United States Liability Insurance Company ("USLI").

24        8.     The Club and Barr are defendants in an action entitled *Christina Pitre*

25   *and Robert Hedberg v. Salinas Golf and Country Club, Inc., Russell Baar, D.C.,*

26   *and Does 1 through 100, inclusive,* Case No. M77015, in the Superior Court of

27   California, in and for the County of Monterey ("the Action").

28

1      9.    On October 25, 2005, Christina Pitre ("Pitre") made a written demand

2  to the Club within the policy period of the USLI policy.  The demand letter

3  enclosed a draft complaint on behalf of Pitre ("Draft Complaint") and stated that

4  Pitre's Department of Fair Employment and Housing ("DFEH") complaint (and

5  request for right-to-sue letter) would be filed the next week and that the complaint

6  would be filed immediately upon the issuance of the right-to-sue letter.

7      10.    The Draft Complaint includes the following allegations:

8          In early 2004, Pitre began an affair with defendant Russell
9          Baar, a member of the Club.  In October 2004, Robert Hedberg
        became concerned after Baar was elected to the Club's board of
10         directors that Baar's involvement with a Club employee (Pitre)
11         could become problematic, and warned the Club's management
        that the situation was a potential liability.
12

13          Pitre ended her affair with Baar in February of 2005, but Barr
14         allegedly continued to: send Pitre text messages on her cell
        phone; approach her at work and ask why she did not return his
15         messages; and come to the street where her apartment was
16         located to see when Pitre came and went.

17          Hedberg's employment at the Club ended while he was on
18         medical leave in March 2005.  A motivating factor for the
        Club's decision to end Hedberg's employment was Hedberg's
19         support of Pitre's efforts to enjoy a harassment-free work
20         environment, as well as Hedberg's refusal to fire Pitre, and
        thereby avoid the liability about which Hedberg had warned
21         Club management.
22

23          On July 8, 2005, the Club fired Pitre for the (allegedly
        pretextual) reason that she was frequently late for work.
24

25      11.    The Draft Complaint advanced the following causes of action: (1)

26  wrongful discharge in violation of public policy, against the Club; (2) hostile work

27  environment, against the Club and Baar; (3) failure to take reasonable steps to

28  prevent harassment from occurring, against the Club; (4) wrongful discharge in

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1  violation of state statute, against the Club; and (5) violation of unfair competition

2  law, against the Club and Baar.

3    12.    On information and belief, the matter was tendered to USLI and USLI

4  assumed the Club's defense on October 31, 2005. Pitre filed the original

5  complaint against the Club and Baar on November 29, 2005. On information and

6  belief, the original complaint was never served. In an email dated January 6,

7  2006, from Pitre's counsel to the Club's counsel, Pitre's counsel advised that he

8  had also been retained by Hedberg to prosecute a wrongful discharge action on

9  Hedberg's behalf. Accordingly, plaintiffs' counsel intended to file a DFEH

10  complaint on behalf of Hedberg, and thereafter would file an amended complaint

11  ("Amended Complaint") on behalf of both Pitre and Hedberg. The Amended

12  Complaint was filed on January 20, 2006.

13    13.    The Amended Complaint includes the allegations made by Pitre in the

14  Draft Complaint, as well as details the circumstances under which Hedberg was

15  allegedly forced to resign. The Amended Complaint (like the Draft Complaint)

16  alleges that a "motivating factor" for the Club's ending of Hedberg's employment

17  was Hedberg's support of "Pitre's efforts to enjoy a harassment—free work

18  environment, and because he had refused to fire [Pitre] so that Club could be rid of

19  her and avoid the liability about which Hedberg had warned" the Club's

20  management.

21    14.    The Amended Complaint advances the following causes of action: (1)

22  wrongful discharge in violation of public policy, against the Club; (2) wrongful

23  discharge in violation of state statute, against the Club; (3) hostile work

24  environment, against the Club and Baar; (4) failure to take reasonable steps to

25  prevent harassment from occurring, against the Club; (5) intentional infliction of

26  emotional distress, against the Club and Baar; and (6) violation of unfair

27  competition law, against the Club and Baar.

28

SEDGWICK
DETERT, MORAN & ARNOLD LLP

15.    The Club tendered the Amended Complaint to USLI. On information and belief, USLI agreed to provide a defense to the Amended Complaint.

16.    The Amended Complaint and the Action was tendered to Philadelphia. On May 9, 2006, Philadelphia declined coverage for the Action and the Amended Complaint based on the Prior and Pending Exclusion (the Prior and Pending Exclusion is cited in paragraph 26 below) and because Philadelphia determined that the Action was related to Pitre's October 25, 2005 written demand made against the Club prior to the inception date of Philadelphia's policy period (the Interrelated Wrongful Act provision is cited in paragraph 22 below).

17.    Philadelphia did not receive any response from the Club until January 17, 2008, when the Club demanded that Philadelphia assume the defense of and agree to indemnify it in the Action. Pitre and the Club settled her allegations of wrongful discharge for $110,000 and USLI withdrew from the defense. Hedberg is the only plaintiff remaining in the Action.

18.    On or around February 26, 2008, Philadelphia accepted the defense of the Club and Barr, and reserved its rights to recoup all Loss, including Defense Costs, paid by Philadelphia on account of the Action.

## FIRST CAUSE ACTION

(Declaratory Judgment That No Duty To Defend Or To Indemnify)

19.    For its first cause of action, Philadelphia incorporates herein by reference, as it fully restated, paragraphs 1 to 18 above.

20.    "Claim" is defined under B. at Part 6 of the Policy, entitled Common Policy Definitions, as:

1.    any written demand for monetary or non-monetary relief;

2.    any judicial, civil, administrative, regulatory or arbitration proceeding (including any appeal therefrom) which subjects an **Insured** to a binding adjudication of liability for monetary or non-monetary relief for a **Wrongful Act**; or

3.    any written request to toll or waive any statute of limitations applicable to any actual or potential suit or causes of action against an **Insured**.

1      21.    The Policy's Declarations provide that . . . "this policy is written on a

2  claims made basis and covers only those claims first made during the policy

3  period. . . ."

4      22.    Coverage is excluded under C. of IV., entitled Notice/Claim

5  Reporting Provisions at Part 8 of the Policy, entitled Common Policy Conditions,

6  which provides:

7          All **Loss** arising out of the same **Wrongful Act** and all
           **Interrelated Wrongful Acts**, or the same related **Workplace**
8          **Violence Acts**, shall be deemed one **Loss** on account of a [sic]
           one **Claim** or one **Workplace Violence Act**. Such **Claim** or
9          **Workplace Violence Act** shall be deemed to be first made or
           to have first occurred when the earliest of such **Claims** or
10         **Workplace Violence Acts** were first made or first occurred.

11         "Interrelated Wrongful Act" is defined under H. at Part 6 of the

12  Policy to mean: "any causally connected Wrongful Act or any series of the same,

13  similar or related Wrongful Acts."

14     23.    The October 25, 2005 correspondence from Pitre's attorney and the

15  Draft Complaint fall within the Policy's definition of "Claim." The Amended

16  Complaint (filed January 20, 2006), which also seeks recovery on behalf of

17  Hedberg, also falls within the definition of "Claim" and the Amended Complaint

18  was filed within the policy period of the Policy.

19     24.    The claims by Pitre were first made prior to November 26, 2005, and,

20  on information and belief, USLI defended those claims. With respect to the

21  Amended Complaint pertaining to Hedberg, as the allegations are Interrelated

22  Wrongful Acts, the Claim as represented by the Amended Complaint is deemed,

23  per operation of Part 8, IV. C, quoted above in paragraph 22, to have been made

24  when the first Claim was made, which was on October 25, 2005, prior to the

25  inception of the Policy.

26     25.    For the reasons outlined above, Philadelphia contends that it has no

27  duty to defend or to indemnify the Club and Baar in the Action.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP
28

26.    Coverage is also excluded by operation of Exclusion F at Part 7.F. of the Policy, entitled Common Policy Exclusions, which provides:

> The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:
>
> arising out of, based upon or attributable to:
>
> 1.    any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page [11/26/2005], or the same or essentially the same facts as alleged in such prior litigation; or
>
> 2.    any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or
>
> 3.    any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonable expect a **Claim** to arise.

27.    In both the Draft Complaint and the Amended Complaint, the wrongful acts, facts and circumstances at issue – the alleged discharge of both Pitre and Hedberg, which focus on alleged harassment and hostile work environment at the Club – arise from the same or Interrelated Wrongful Acts. The allegations of the sexual harassment of Pitre, Hedberg's warning to Club management with respect to the potential liability to the Club arising from Baar's conduct, and Hedberg's support of "Pitre's efforts to enjoy a harassment-free work environment," are central themes of both the Draft Complaint and the Amended Complaint. Therefore, Hedberg's claims in the Amended Complaint are interrelated with Pitre's claims made in the Draft Complaint.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

28.    Written notice of these wrongful acts, facts and circumstances was given to USLI in connection with the Club's tender of defense of the claim first made by Pitre on October 25, 2005. Because the allegations in the Amended Complaint "arise out of, are based upon, or are attributable to" the allegations in the October 25, 2005 correspondence and the Draft Complaint, Exclusions F.1. and F.2. apply.

29.    For the reasons outlined above, Philadelphia contends that it has no duty to defend or to indemnify the Club and Baar in the Action.

30.    An actual controversy has arisen and now exists between Philadelphia and the Club concerning their respective rights and duties under the Policy and that Philadelphia contends that it has no duty to defend or to indemnify the Club and Baar in the Action. On information and belief, the Club contends that Philadelphia has a duty to defend and to indemnify the Club and Baar in the Action.

31.    Philadelphia desires a judicial determination of its rights and duties, if any, and a declaration that it has no duty to defend or to indemnify the Club and Baar under the Policy in the Action.

32.    A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as forementioned. Such controversy is incapable of resolution without judicial adjudication. Accordingly, Philadelphia has no plain or speedy or adequate remedy at law, and request a declaratory judgment, adjudicating and declaring that Philadelphia has no duty to defend or to indemnify the Club in the Action.

## SECOND CAUSE OF ACTION

(Reimbursement of Defense Fees and Costs and Indemnity)

33.    For its second cause of action, Philadelphia incorporates herein by reference, as it fully restated, paragraphs 1 to 32 above.

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1    34.    In light of the fact that all of the costs and fees incurred in the defense

2  of the Club and Baar in the Action and any indemnity which may be paid in

3  connection with a resolution of the Action are not the responsibility of

4  Philadelphia inasmuch there is no coverage for the Action and/or any such

5  coverage is excluded, Philadelphia is entitled to a full and complete

6  reimbursement of all such fees, costs, and indemnity incurred or to be incurred in

7  connection with the Action.

8    35.    Philadelphia is entitled to recover damages from Club in a sum which

9  will be provided at trial.

10                          PRAYER FOR RELIEF

11    WHEREFORE, plaintiff Philadelphia Indemnity Insurance Company prays

12  for relief as follows:

13    1. For a judgment that, by reason of the terms, conditions, and exclusions in

14  the Policy, no duty to defend or to indemnify is owed to the Club and Baar in

15  connection with the Action;

16    2. For a judgment that Philadelphia is entitled to restitution and

17  reimbursement from the Club for any and all sums expended in defense or

18  settlement of the Action;

19    3. On all causes of action, for interest, including prejudgment interest;

20    4. On all causes of action, for costs herein and;

21    5. For such other and further relief as the court deems to be just and proper.

22

23  DATED: April 1, 2008          SEDGWICK, DETERT, MORAN & ARNOLD LLP

24

25                          By: _____

26                               BRIAN D. HARRISON
                                 Attorneys for Plaintiff
27                               PHILADELPHIA INDEMNITY INSURANCE
                                 COMPANY
28

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

1

## DEMAND FOR JURY TRIAL

2    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff

3  Philadelphia Indemnity Insurance Company hereby demands a jury trial for this

4  action.

5

6  DATED: April 1, 2008          SEDGWICK, DETERT, MORAN & ARNOLD LLP

7

8

9                    By: _____
                         BRIAN D. HARRISON
                         Attorneys for Plaintiff
10                       PHILADELPHIA INDEMNITY INSURANCE
                         COMPANY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP

PI-NPD-1 (01-02)

### Philadelphia Indemnity Insurance Company
### One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
### 610.617.7900    Fax:  610.617.7940

**FLEXIPLUS FIVE**
**NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY INSURANCE**
**EMPLOYMENT PRACTICES LIABILITY INSURANCE**
**FIDUCIARY LIABILITY INSURANCE**
**WORKPLACE VIOLENCE INSURANCE**
**INTERNET LIABILITY INSURANCE**

Policy Number: PHSD165265

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS-MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item   1.      Parent Organization and Address:
               SALINAS GOLF & COUNTRY CLUB
               PO Box 4277
               Salinas, CA 93912-4277


               Internet Address: www. salinascountryclub.com


Item   2.   Policy Period:        From: 11/26/2005  To: 11/26/2006
                                 (12:01 A.M. local time at the address shown in Item 1.)

Item   3.   Limits of Liability:
            (A)    Part 1, D&O Liability:          $    1,000,000  each Policy Period.
            (B)    Part 2, Employment Practices:   $    1,000,000  each Policy Period.
            (C)    Part 3, Fiduciary Liability:    $               each Policy Period.
            (D)    Part 4, Workplace Violence:     $               each Policy Period.
            (E)    Part 5, Internet Liability:     $               each Policy Period.
            (F)    Aggregate, All Parts:           $    2,000,000  each Policy Period.

Item   4.   Retention:
            (A)    Part 1, D&O Liability:          $       5,000  for each Claim under
                                                                  Insuring Agreement B & C.
            (B)    Part 2, Employment Practices:   $       5,000  for each Claim.
            (C)    Part 3, Fiduciary Liability:    $              for each Claim.
            (D)    Part 4, Workplace Violence:     $              for each Workplace Violence
                                                                  Act.
            (E)    Part 5, Internet Liability:     $              for each Claim.

PI-NPD-1 (01-02)

Item    5.    Prior and Pending Date: Part 1    11/26/2005    Part 2    11/26/2005
                                       Part 3  No Date Applies  Part 4  No Date Applies
                                       Part 5  No Date Applies

Item    6.    Premium:    Part 1 $  1,285.00    Part 2 $   531.00    Part 3
                          Part 4                Part 5

                                                    Total Premium: $  1,816.00

Item    7.    Endorsements: PER SCHEDULE ATTACHED

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized
officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

_____    _____    _____
Authorized Representative         Countersignature                 Countersignature Date

Philadelphia Indemnity Insurance Company

Form Schedule – Flexi Plus Five

**Policy Number:** PHSD165265

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-NPD-1 | 0102 | FlexiPlus Five Declarations Page |
| PI-NPD-2 | 0102 | Flexi Plus Five Policy |
| PI-NPD-25 | 0102 | Professional Services Exclusion(Supervision Carve-Out) |
| PI-NPD-44 | 0102 | Third Party EPLI Exclusion |
| PI-NPD-52 | 1203 | Amendment of Exclusions |
| PI-SLD-001 | 0103 | Cap on Losses from Certified Acts of Terrorism |
| PI-PL-CA | 0198 | California Amendatory Endorsement |

PP-0701 07-01

# PHILADELPHIA INSURANCE COMPANIES

## PRIVACY POLICY NOTICE

### Philadelphia Insurance Company & Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies values your privacy and we are committed to protecting personal information that we collect during the course of our business relationship.

The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information we collect and how it may be disclosed. This does not reflect a change in the way we do business or handle your information.

**Information We Collect:**

We collect personal information about you from the following sources:
- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

**Information We Disclose:**

We will only disclose the information described above, as permitted by law, to our affiliates and non-affiliated third parties when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:
- Your agent or broker;
- Parties who perform a business, professional or insurance function for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, other insurers, medical care institutions and attorneys who need the information to investigate, defend or settle a claim involving you;
- Insurance regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes.
We do not disclose the personal information of persons who have ceased to be our customers.

**Protection of Information:**

The Philadelphia Insurance Companies maintains physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

**How to Contact Us:**

Feel free to call or write to us for additional information.

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
(877) 438-7459

POLICY NUMBER: PHSD165265                                    IL 09 85 01 03

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT OF 2002

### SCHEDULE*

---

Terrorism Premium (Certified Acts)
$ 0


Additional information, if any, concerning the terrorism premium:

---

\*     Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act of 2002, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

PI-NPD-2 (1-02)

FLEXI PLUS FIVE
NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE
WORKPLACE VIOLENCE INSURANCE
INTERNET LIABILITY INSURANCE

**EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS IS A CLAIMS MADE POLICY.**

**CLAIMS MADE POLICIES ONLY COVER THOSE CLAIMS MADE AGAINST THE INSURED DURING THE POLICY PERIOD.**

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

### Part 1
### Not-for-Profit Organization Directors & Officers Liability Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.    INSURING AGREEMENTS

    A.   The **Underwriter** will pay on behalf of the **Individual Insured, Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Organization** has indemnified the **Individual Insureds** for such **Loss**.

    B.   The **Underwriter** will pay on behalf of the **Organization, Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Organization** has indemnified such **Individual Insureds** for such **Loss**.

    C.   The **Underwriter** will pay on behalf of the **Organization, Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period) and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II.   DEFINITIONS

    A.   **D&O Wrongful Act** means any actual or alleged:

       1.   act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or by the **Organization**; or

       2.   act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** while serving as a director, officer, governor or trustee of any **Outside Entity**, if such service is at the written request or direction of the **Organization**.

PI-NPD-2 (1-02)

However, **D&O Wrongful Act** does not include an **Employment Practice Act, Fiduciary Liability Act**, or **Internet Liability Act**.

B. **Outside Entity** means:

1. any not-for-profit entity described in section 501(c) of the Internal Revenue Code of 1986 (as amended); or

2. any other entity listed as an **Outside Entity** in an endorsement to this Policy.

C. **Personal & Advertising Injury** means any actual or alleged:

1. false arrest, detention or imprisonment, or malicious prosecution; or

2. oral or written publication of material that slanders or libels a person or entity or disparages a person's or entity's goods, products or services; or

3. oral or written publication of material that violates a person's right of privacy; or

4. wrongful eviction or entry or other invasion of the right of privacy; or

5. misappropriation of advertising ideas, unauthorized use of title or slogan, or plagiarism; or

6. infringement of copyright or trademark.

III. **EXCLUSIONS**

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

A. arising out of, based upon or attributable to any actual or alleged infringement of any patent or misappropriation of trade secrets;

B. arising out of, based upon or attributable to any actual or alleged:

1. publication or utterance of material by or at the direction of such **Insured** with knowledge of its falsity; or

2. composing, editing, designing, publishing, distributing or printing periodicals, advertisements or other materials by the **Insured** for another party if such activity is not in connection with and not a regular part of the **Insured's** own publications; or

3. failure of goods, products or services to conform with advertised quality or performance; or

4. wrong description of the price of goods, products or services;

C. arising out of, based upon or attributable to any actual or alleged breach of contract or agreement. However, this exclusion shall not apply to the following:

PI-NPD-2 (1-02)

1. liability of the **Insured** which would have attached even in the absence of such ontract or agreement; or

2. **Defense Cost.**

IV.    PRESUMPTIVE INDEMNIFICATION

If the **Organization** is permitted or required by common or statutory law, but fails to indemnify the **Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention amount set forth in Item 4(A) of the Declarations Page. The charter, by-laws, shareholder and board of director's resolutions of the **Organization** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

### Part 2
### Employment Practices Liability Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.    INSURING AGREEMENTS

A.  The **Underwriter** will pay on behalf of the **Insured, Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practices Act.**

II.    DEFINITIONS

A.  **Employment Practice Act** means any actual or alleged:

1.  wrongful dismissal, discharge or termination of employment;

2.  breach of a written or oral employment contract or implied employment contract;

3.  employment related misrepresentation;

4.  wrongful failure to promote;

5.  violation of employment discrimination laws (including harassment);

6.  wrongful deprivation of a career opportunity;

7.  employment related wrongful discipline;

8.  negligent employee evaluation;

9.  employment related invasion of privacy;

10. employment related defamation (including libel and slander);

11. sexual or workplace harassment of any kind;

PI-NPD-2 (1-02)

12. constructive discharge of employment;

13. employment related retaliation;

14. employment related humiliation;

15. wrongful demotion;

16. negligent reassignment;

17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Act** means any actual or alleged wrongful failure to employ, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

However, **Employment Practices Act** does not include a **D&O Wrongful Act**, **Fiduciary Liability Act**, or **Internet Liability Act**.

B.   **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Organization**.

III.   **EXCLUSIONS**

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.   arising out of, based upon or attributable to any failure to comply with any law concerning Workers Compensation, Unemployment Insurance, Social Security, Disability Benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above laws;

B.   arising out of, based upon or attributable to any violation of any of the responsibilities, obligations, or duties imposed by the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act ( except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above statute, law, rule, regulation or order;

C.   arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements;

PI-NPD-2 (1-02)

D. arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment,  or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

   1. liability of the **Organization** which would have attached even in the absence of such contract or agreement; or

   2. **Defense Costs.**

E. to the extent such **Loss** constitutes employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay.

## Part 3
## Fiduciary Liability Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.    INSURING AGREEMENTS

A. The **Underwriter** will pay on behalf of the **Insured, Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period); and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act.**

II.   DEFINITIONS

A. **Administration** means: (i) giving counsel to employees, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of employees or participants under any **Benefit Plan.**

B. **Benefit Plan** means:

   1. any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Organization** solely for the benefit of the employees of the **Organization**;

   2. any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Organization** solely for the benefit of the employees of the **Organization**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

   3. any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the employees of the **Organization**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice

PI-NPD-2 (1-02)

to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

4. any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for employees of the **Organization**.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

However, **Benefit Plan** does not include any multi-employer plan.

C. **Fiduciary Liability Act** means any actual or alleged:

1. breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

2. negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

However, **Fiduciary Liability Act** does not include a **D&O Wrongful Act** or an **Internet Liability Act**.

D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA**.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C. arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D. arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

PI-NPD-2 (1-02)

### Part 4
#### Workplace Violence Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.    INSURING AGREEMENTS

    A.  The **Underwriter** will pay on behalf of the **Organization** any **Violence Damage**, resulting from a **Workplace Violence Act** occurring during the **Policy Period** and reported to the **Underwriter** pursuant to the terms of this Policy.

II.   DEFINITIONS

    A.  **Violence Damage** means:

        1.  **Business Interruption Expense**

        2.  **Public Image Restoration Expense**

        3.  **Workplace Violence Expense**

    B.  **Business Interruption Expense** means the amount calculated as set forth below for a period of time commencing on the day the **Workplace Violence Act** occurs until the earlier of ninety (90) days following such date, or until the **Organization** restores operations with due diligence and dispatch to the level that existed prior to the **Workplace Violence Act**:

        1.  The sum of:

            a.  net profits before income taxes that would have been earned had no **Workplace Violence Act** occurred; and

            b.  the actual cost of continuing the activities which are necessary for the **Organization** to resume operations with substantially the same quality of service which existed immediately preceding the **Workplace Violence Act**; and

            c.  reasonable expenses which would not have been incurred except for such **Workplace Violence Act** and which were incurred by the **Organization** for the sole purpose of reducing **Business Interruption Expense** described in B.1. (a or b) above, not to exceed the amount of actual reduction of such **Business Interruption Expense**; and

        2.  Less the sum of:

            a.  all recoveries, other insurance, suretyship and other indemnity which cover **Business Interruption Expense** described in B.1. above; and

            b.  the amount by which the **Organization** reasonably could have but fails to reduce **Business Interruption Expense** described in B.1. above.

PI-NPD-2 (1-02)

C. **Public Image Restoration Expense** means reasonable fees and expenses for, or cost of:

   1. an independent public relations consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

   2. an independent security consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

   3. a counseling seminar for **Individual Insureds** conducted by an independent consultant following the **Workplace Violence Act**;

   4. independent security guard service for up to thirty (30) days following the date the **Workplace Violence Act** occurs;

   5. an independent forensic analyst for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

D. **Workplace Violence Expense** means the reasonable fees and expenses for, or cost of:

   1. the **Salary** or **Wages**, for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays **Individual Insureds** victimized by **Workplace Violence Acts** and unable to continue to work because of such **Workplace Violence Acts**. The **Salary** or **Wages** in effect at the time of the **Workplace Violence Act** shall apply.

   2. the **Salary** or **Wage**, for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays a newly hired person(s) to conduct the duties of **Individual Insureds** victimized by **Workplace Violence Acts** and who is/are unable to continue to work because of such **Workplace Violence Acts**; however such **Salary** or **Wage** shall not exceed the **Salary** or **Wage** of the victimized **Individual Insured** in effect at the time of the **Workplace Violence Act**.

E. **Workplace Violence Act** means any actual or alleged intentional and unlawful use of, or threat to use, deadly force with an intent to cause harm at the **Premises.**

F. **Premises** means any building, facility or property occupied by the **Organization** in conducting its operations.

G. **Salary or Wage** means compensation the **Organization** pays an **Individual Insured**, including but not limited to bonus, commission, incentive payments, and the cost of health, welfare and pension benefits.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 4 to make any payment for **Violence Damage:**

A. arising out of, based upon or attributable to war, invasion, insurrection, riot, rebellion, revolution, civil war, or military action;

PI-NPD-2 (1-02)

B.  arising out of, based upon or attributable to a **Workplace Violence Act** which occurs at any location other than the **Premises**;

C.  arising out of, based upon or attributable to the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property.

D.  arising out of, based upon or attributable to a **Workplace Violence Act** occurring prior to the Prior and Pending Date shown in Item 5 of the Declarations Page.

## Part 5
### Internet Liability Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.   INSURING AGREEMENTS

A.  The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Internet Liability Act**.

II.  DEFINITIONS

A.  **Internet Activity** means any display, transmission, dissemination, or other use of **Matter** on an **Internet Site**.

B.  **Internet Site** means the internet address(es) shown in Item 1 of the Declarations Page.

C.  **Matter** means printed, verbal, numerical, audio or visual expression, or any other expression, regardless of the medium upon which such expression is fixed.

D.  **Product** means any tangible property offered for sale or otherwise disseminated by or through any **Insured**.

E.  **Internet Liability Act** means any actual or alleged act, error, or omission committed or attempted by an **Insured** in their capacity as an **Insured** solely in connection with **Internet Activity** by or on behalf of the **Organization**, including:

1.  libel, slander, or oral or written publication of defamatory or disparaging material; or

2.  invasion of or interference with the right of privacy; or

3.  infringement of copyright, service mark, trademark, trade dress or trade name or title or slogan or improper use of literary or artistic titles, formats or performances.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 5 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.  arising out of, based upon or attributable to any actual or alleged price fixing, restraint

PI-NPD-2 (1-02)

of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto; or any rules and regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

B.   arising out of, based upon or attributable to any actual or alleged breach of contract or agreement, or for liability assumed by the **Organization** under a contract or agreement; however, this exclusion shall not apply to any of the following:

   1.   liability of the **Organization** which would have attached even in the absence of such contract or agreement;

   2.   **Defense Cost;**

C.   arising out of, based upon or attributable to any actual or alleged:

   1.   wrong description of the price or authenticity of an **Product**; or

   2.   failure of any **Product** to conform with advertised quality or performance; or

   3.   sale or offer for sale of any **Product** that infringes upon the name, design or logo of another entity's **Product**;

D.   arising out of, based upon or attributable to any actual or alleged infringement of any patent or misappropriation of trade secrets;

E.   to the extent such **Loss** constitutes amounts charged to or due from clients or customers of the **Organization**, or the value of any electronic fund transfer or transaction by or on behalf of the **Organization** which is lost or damaged during transfer into, from or between **Organization** accounts;

F.   brought or maintained by or on behalf of any federal, state, or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulations;

G.   arising out of, based upon or attributable to the development, distribution, dissemination, installation, implementation, operation, maintenance and/or filtering software, or of policies, equipment or procedures for establishing or managing a secure method for exchanging electronic information;

H.   arising out of, based upon or attributable to any costs, expenses or other payment incurred by the **Insured** or others in connection with the withdrawal or recall from the marketplace of the **Insured's Products**, including other products which incorporated the **Insured's Products**;

I.   arising out of, based upon or attributable to coupons, price discounts, prizes, awards, or any any other valuable consideration given in excess of the total contracted or expected amount;

J.   (i) a computer virus, (ii) the unauthorized access to or use of a computer, computer system or computer network, or (iii) the inability of an authorized **Third Party** to access

PI-NPD-2 (1-02)

services provided by the **Organization** through the **Internet Site**.

## Part 6
## Common Policy Definitions

A. **Application** means:

1. the **Application** for this Policy, including any material submitted therewith; and

2. the **Application**(s), including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means for the purposes of Parts 1, 2, 3, and 5:

1. any written demand for monetary or non-monetary relief; or

2. any judicial, civil, administrative, regulatory, or arbitration proceeding (including any appeal therefrom), which subjects an **Insured** to a binding adjudication of liability for monetary or non-monetary relief for a **Wrongful Act**; or

3. any written request to toll or waive any statute of limitations applicable to any actual or potential suit or cause of action against an **Insured**.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

C. **Damage** means a monetary judgement, award or settlement including punitive, exemplary or multiple portion thereof, or, with respect to Part 4 (Workplace Violence Insurance), **Violence Damage**.

D. **Defense Cost** means:

1. any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim**, except that **Defense Cost** shall not include:

   a. any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

   b. salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2 below; or

   c. salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**.

2. a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured**

PI-NPD-2 (1-02)

at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E. **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

F. **Individual Insured** means:

1. any individual who has been, now is or shall become a director, officer, governor, trustee, equivalent executive, employee (whether salaried or not), volunteer, leased or temporary employee, or committee member of the **Organization** or, solely with respect to Part 3 (Fiduciary Liability Insurance), of any **Benefit Plan**;

2. the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Organization**, but only for actual or alleged **Wrongful Acts** of such executive for which such spouse may be liable as the spouse of such executive.

3. the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in (1) above which, in the absence of such death or incompetence, would have been covered by this Policy;

4. with respect to an **Organization** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Organization** that is equivalent to any position described in (1) above.

G. **Insured** means the **Organization** and **Individual Insured**.

H. **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

I. **Loss** means:

1. **Damages**;

2. **Defense Cost**;

but **Loss** does not include:

1. criminal or civil fines or penalties imposed by law; except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or

2. taxes; or

3. matters deemed uninsurable under the law to which this Policy shall be construed; or

4. any amounts other than **Defense Cost**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

5. any costs other than **Defense Cost** associated with any accommodation required

PI-NPD-2 (1-02)

pursuant to the American With Disabilities Act, the Civil Rights Act of 1964, rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

J. **Organization** means:

1. the **Parent Organization**,

2. any **Subsidiary**, and

3. solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

K. **Parent Organization** means the first entity named in Item 1 of the Declarations Page.

L. **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

M. **Subsidiary** means:

1. any not-for-profit entity for which, on or before the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, provided such entity is identified as a **Subsidiary** in the **Application**;

2. any not-for-profit entity for which, after the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total less than 35% of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period**. The **Parent Organization** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

3. any not-for-profit entity for which, after the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total 35% or more of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period**; but only upon the condition that before the end of the **Policy Period** or within 90 days from having the right to elect or select a majority of the directors or trustees, whichever is lesser, the **Parent Organization** shall have provided the **Underwriter** with full particulars and agreed to any additional premium and/or amendment of the provisions of this Policy.

4. any for profit entity or the directors, officers, or trustees of a for profit entity for which, the **Underwriter**, at its sole discretion, agrees by written endorsement to provide coverage upon such terms or additional premium charged.

Further, coverage as shall be afforded by paragraphs 3 and 4 above is conditioned upon the **Parent Organization** paying when due any applicable additional premium required by the **Underwriter** relating to such new **Subsidiary**.

N. **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

PI-NPD-2 (1-02)

O.  **Wrongful Act** means:

   1.  with respect to Part 1, any **D&O Wrongful Act**,

   2.  with respect to Part 2, any **Employment Practices Act**,

   3.  with respect to Part 3, any **Fiduciary Liability Act**,

   4.  with respect to Part 5, any **Internet Liability Act**

## Part 7
## Common Policy Exclusions

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

   A.  arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission.

   B.  arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission.   This exclusion shall not apply to a **Workplace Violence Act** under Part 4 (Workplace Violence Insurance);

   No **Wrongful Act** of any **Insured** shall be imputed to any **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

   C.  arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

   D.  arising out of, based upon or attributable to any bodily injury or property damage regarding tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

   E.  arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and ByProduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

PI-NPD-2 (1-02)

F.  arising out of, based upon or attributable to:

1.  any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

2.  any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

1.  any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G.  arising out of, based upon or attributable to the insolvency, conservatorship, receivership,   bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.  to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.  for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to Part 4 (Workplace Violence Insurance) or to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.  brought  or maintained by, at the behest, or on behalf of the **Organization**;

K.  for any actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA**; however, this exclusion shall not apply to Part 3 (Fiduciary Liability Insurance);

L.  for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.  for service by the **Individual Insured** in any position or capacity in any entity other than the **Organization**, a **Benefit Plan** or an **Outside Entity**, even if the **Organization** directed or requested the **Individual Insured** to serve in such other position or capacity.

PI-NPD-2 (1-02)

## Part 8
## Common Policy Conditions

I.   LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made or **Workplace Violence Acts** committed, the **Underwriter's** liability under the Policy is limited as follows:

A.   With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Damages** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3(A) of the Declarations.

B.   With respect to coverage under Part 2, Part 3, Part 4, or Part 5 of this Policy, the **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** made, and all **Workplace Violence Acts** taking place, during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3(B), 3(C), 3(D) or 3(E), respectively, of the Declarations.

C.   The **Underwriter's** maximum aggregate liability for all **Damage** on account of all **Claims** first made, and all **Workplace Violence Acts** taking place, during the **Policy Period** under all purchased **Parts**, combined, shall be the Aggregate Limit of Liability set forth in Item 3(F) of the Declarations.  The Limits of Liability set forth in Item 3(A), 3(B), 3(C), 3(D) and 3(E) are sub-limits which do not increase the **Underwriter's** maximum liability as set forth in Item 3(F).

D.   **Defense Cost** is in addition to and is not part of the Limit of Liability specified in Item 3 of the Declarations.  Payment by the **Underwriter** of **Defense Cost** incurred on account of any **Claim** shall not serve to reduce the Limit of Liability stated in Item 3 of the Declarations, but the **Underwriter** is not obligated to pay any **Defense Cost** after the applicable Limit of Liability has been exhausted by payment of **Damages**.

E.   The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II.   RETENTION CLAUSE

A.   The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** or **Workplace Violence Act** which is in excess of the respective Retention stated in Item 4 of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Organization** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts** and all related **Workplace Violence Acts**.

III.   DEFENSE AND SETTLEMENT

A.   The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim**.  However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**.  Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the

PI-NPD-2 (1-02)

provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

B. If the **Insured** has assumed the defense of a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Cost** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Defense Cost** incurred, settlements made or judgements admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.

C. The **Underwriter** may investigate and, with the consent of the **Insured**, settle any **Claim** or **Workplace Violence Act** as the **Underwriter** deems expedient, but the **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D. In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall take reasonable measures to protect their interests.

E. If more than one **Insured** is involved in a **Claim**, the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds**.

F. The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** or a **Workplace Violence Act**, the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Cost** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4 of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability which is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4 of the Declarations Page, even if consent is given to a subsequent settlement.

PI-NPD-2 (1-02)

IV.    NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.  Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.    In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice of such **Claim** or **Workplace Violence Act** as soon as practicable to the **Underwriter** during this **Policy Period**, or, if applicable, during any Extension Period, but, not later than 60 days after the expiration date of this Policy or any Extension Period, if applicable.

B.    If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to the **Wrongful Act**, dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.    All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts**, or the same or related **Workplace Violence Acts**, shall be deemed one **Loss** on account of a one **Claim** or one **Workplace Violence Act**.  Such **Claim** or **Workplace Violence Act** shall be deemed to be first made or to have first occurred when the earliest of such **Claims** or **Workplace Violence Acts** were first made or first occurred.

V.    CANCELLATION AND NON RENEWAL

A.    The **Underwriter** may not cancel this Policy except for failure to pay premium when due, in which case 10 days written notice shall be given to the **Parent Organization** for such cancellation to be effective.

B.    The **Parent Organization** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Parent Organization** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C.    The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be sent to the **Parent Organization** at least 30 days prior to expiration of the **Policy Period**.

PI-NPD-2 (1-02)

VI.    REPRESENTATIONS AND SEVERABILITY

A.  The **Insured** represent that the particulars and statements contained in the
**Application** are true and agree that (1) those particulars and statements are the basis
of this Policy and are to be considered as incorporated into and constituting a part of
this Policy; (2) those particulars and statements are material to the acceptance of the
risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in
reliance upon the truth of such representations.

B.  Except for material facts or circumstances known to the **Individual Insured** signing the
**Application,** no statement in the **Application** or knowledge or information possessed
by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of
determining the availability of coverage.

VII.   SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the
extent of such payment to all of the **Insured's** rights of recovery.  The **Insured** shall
execute and deliver such instruments and papers and do whatever else is necessary to
secure such rights and shall do nothing to prejudice or compromise such rights without the
**Underwriter's** express written consent.

VIII.  EXTENSION PERIOD

A.  If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the
coverage granted under Part 1, 2, 3, and 5 of this Policy for any **Claim** first made
against the **Insured** during the 60 days after the non-renewal date, but only with
respect to any **Wrongful Act** committed before such non-renewal date and otherwise
covered by this Policy (the "Automatic Extension").  This Automatic Extension shall not
apply if the **Insured** has purchased similar insurance from the **Underwriter** or any
other insurer covering such **Claim.**

Upon expiration of the Automatic Extension, the **Parent Organization** shall have the
right, upon payment of an additional 50%, 75%, 100% of this Policy's annual premium
to an extension of the coverage granted by this Policy for any **Claim** first made against
the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36)
months, respectively, after the expiration of the Automatic Extension, but only with
respect to **Wrongful Acts** committed before the non-renewal date and otherwise
covered by this Policy (the "Extension Period"); provided however, that the request for
this Extension Period must be made to the **Underwriter** in writing and payment of the
additional premium must be made prior to the expiration of the Automatic Extension. In
the event similar insurance is in force covering any **Claims** first made during this
Extension Period, coverage provided by this Policy shall be excess over any such other
insurance.

B.  If the **Parent Organization** cancels or does not renew this Policy or the **Underwriter**
cancels for nonpayment of premium, the following will apply:

The **Parent Organization** shall have the right, upon payment of an additional 50%,
75%, or 100% of this Policy's annual premium, to an extension of the cover granted
under Parts 1, 2, 3 and 5 of this Policy for any **Claim** first made against the **Insured**

PI-NPD-2 (1-02)

during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C. All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX.    **CHANGES**

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** or **Workplace Violence Act**, except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X.    **ASSIGNMENT**

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI.    **AUTHORIZATION CLAUSE AND NOTICES**

By acceptance of this Policy, the **Insured** agrees that the **Parent Organization** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Parent Organization** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Parent Organization** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Parent Organization** shall be the agent of any **Insured** to effect changes in this Policy.

XII.    **OTHER INSURANCE**

If the **Insured** has any other insurance for **Claims** or **Workplace Violence Acts** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

PI-NPD-2 (1-02)

XIII.  TERMS OF POLICY CONFORMED TO STATUTE

Terms of this Policy which are in conflict with the statutes of any state in which this Policy is issued are hereby amended to conform to such statutes.

XIV.  ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XV.  ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.  No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.  Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XVI.  CHANGE IN OWNERSHIP OR CONTROL

A.  If after the inception of the **Policy Period**:

1.  the **Organization** merges into or consolidates with another entity such that the other entity is the surviving entity; or

2.  another entity or person or group of entities and/or persons acting in concert acquires more than fifty percent (50%) of the assets of the **Organization**; or

3.  another entity or person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of the **Organization's** directors or trustees;

(1., 2., and 3. above hereinafter referred to as the "Merger"), then coverage under Parts 1, 2, 3, and 5 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** (or the Extension Period, if purchased) for a **Wrongful Acts** committed prior to the effective date of the Merger and only if the following conditions are met:

1.  the **Insured** provides written notice of the Merger to the **Underwriter** within 45 days of the effective date of such Merger; and

2.  the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary.

If **Insured** fails to meet conditions 1. & 2. above, this Policy shall be deemed cancelled by the **Underwriter** as of the effective date of the Merger and the **Underwriter** shall return any unearned premium on a pro-rata basis. The **Insured** shall have the right to purchase the Extension Period.

Coverage under Part 4 of this Policy shall cease with respect to any **Workplace Violence Act** occurring after the effective date of the Merger.

B. If after the inception of the **Policy Period**:

    1. the **Organization** acquires or assumes more than fifty percent (50%) of the assets, liabilities, or equity of, or merges with any for profit entity or creates a for-profit subsidiary, no coverage shall be afforded under this Policy for **Claims** arising out of, based upon or attributable to such transaction unless all of the following conditions are met:

        a. the **Underwriter** receives from the **Parent Organization** full details of such transaction; and

        b. the **Underwriter**, at its sole discretion, agrees by written endorsement to this Policy to provide coverage to the for-profit entity upon such terms, conditions and limitations as it may require.

## XVII. TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed or any **Workplace Violence Act** occurring anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgement is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgement is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

## XVIII. TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Parent Organization** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim** or **Workplace Violence Act**. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Parent Organization** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, **Workplace Violence Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

## XIX. ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Organization**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss. Any such allocation

PI-NPD-2 (1-02)

shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

IN WITNESS WHEREOF, the **Underwriter** has caused this Policy to be signed by its President and Secretary, but the same shall not be binding upon the **Underwriter** unless countersigned by an authorized representative of the **Underwriter**.

Secretary                                    President

PI-NPD-25 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PROFESSIONAL SERVICES EXCLUSION (SUPERVISION CARVE-OUT)

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

Provided, however, that the foregoing shall not be applicable to any derivative action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

PI-NPD-44 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## THIRD PARTY EPLI EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part 2, Section II. DEFINITIONS, A. **Employment Practice Act** is amended to read:

A.  **Employment Practice Act** means any actual or alleged:

    1.    wrongful dismissal, discharge or termination of employment;

    2.    breach of a written or oral employment contract or implied employment contract;

    3.    employment related misrepresentation;

    4.    wrongful failure to promote;

    5.    violation of employment discrimination laws (including harassment);

    6.    wrongful deprivation of a career opportunity;

    7.    employment related wrongful discipline;

    8.    negligent employee evaluation;

    9.    employment related invasion of privacy;

    10.   employment related defamation (including libel and slander);

    11.   sexual or workplace harassment of any kind;

    12.   constructive discharge of employment;

    13.   employment related retaliation;

    14.   employment related humiliation;

    15.   wrongful demotion;

    16.   negligent reassignment;

    17.   violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

However, **Employment Practices Act** does not include a **D&O Wrongful Act, Fiduciary Liability Act**, or **Internet Liability Act**.
It is further agreed, Section III. EXCLUSIONS, is amended to include:

which is brought by or made on behalf of any **Third Party**.

PI-NPD-52 (12/03)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

**FLEXI PLUS FIVE**

With regard to Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for retaliation; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim for Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 6 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

PI-SLD-001 (01/03)

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

## PROFESSIONAL LIABILITY

## *DIRECTORS AND OFFICERS LIABILITY*

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

PI-PL-CA (1/98)

## THIS ENDORSMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CALIFORNIA AMENDATORY ENDORSEMENT

To be attached to and form a part of all policies written in California.

In consideration of the premium charged, it is understood and agreed that:

The CANCELLATION AND NONRENEWAL POLICY CONDITIONS is hereby deleted and replaced with the following:

A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. All Policies In Effect For 60 Days Or Less

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

a. 10 days before the effective date of cancellation if we cancel for:

(1) Nonpayment of premium; or

(2) Discovery of fraud or material misrepresentation by:

(a) Any insured or his or her representative in obtaining this insurance; or

(b) You or your representative in pursuing a claim under this policy.

b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. All Policies In Effect For More Than 60 Days

a. If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

(1) Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

(2) Discovery of fraud or material misrepresentation by:

(a) Any insured or his or her representative in obtaining this insurance; or

(b) You or your representative in pursuing a claim under this policy.

(3) A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

PI-PL-CA (1/98)

(4) Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

(5) Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

(6) A determination by the Commissioner of Insurance that the:

(a) Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

(b) Continuation of the policy coverage would:

(1) Place us in violation of California law or the laws of the state where we are domiciled; or

(2) Threaten our solvency.

(7) A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

(a) We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

(1) 10 days before the effective date of cancellation if we cancel for a reason listed in Paragraph 3.a.(1) or 3.a.(2); or

(2) 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph 3.a.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

B. The following is added and supersedes any provisions to the contrary:

NONRENEWAL

1. Subject to the provisions of Paragraphs B.2. below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

PI-PL-CA (1/98)

2. We are not required to send notice of nonrenewal in the following situations:

   (a.) If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

   (b.) If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph B.1.

   (c.) If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

   (d.) If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

   (e.) If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

   (f.) If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph B.1, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

3. If we fail to give the timely notice required in Paragraph B.1., the policy shall be continued, with no change in terms or conditions, for a period of 60 days after we deliver said written notice.

**CIVIL COVER SHEET**

**JS 44** (Rev. 12/07) (cand rev 1-08)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Philadelphia Indemnity Insurance Company | Salinas Golf and Country Club, Inc, and Russell Baar |

| (b) County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant Monterey |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c) Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Sedgwick, Detert, Moran & Arnold LLP | Charles R. Keller, Bar No. 35832 |
| Brian D. Harrison, Bar No. 157123 | Fenton & Keller |
| One Market Plaza, Steuart tower, 8th Floor | 2801 Monterey Salinas Highway |
| San Francisco, California 94105 | Monterey, California 93940 |

C 08 01773 HRL

ORIGINAL   ADR   E-FILING

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff (For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [X] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [X] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [X] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— Med. Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury— Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [X] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | [ ] 820 Copyrights | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | **PERSONAL PROPERTY** | [ ] 640 R.R. & Truck | [ ] 830 Patent | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 370 Other Fraud | [ ] 650 Airline Regs. | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 371 Truth in Lending | [ ] 660 Occupational Safety/Health | | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal Property Damage | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 385 Property Damage Product Liability | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 810 Selective Service |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | | [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 195 Contract Product Liability | | | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 196 Franchise | | | [ ] 730 Labor/Mgmt.Reporting & Disclosure Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | **FEDERAL TAX SUITS** | [ ] 892 Economic Stabilization Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | **Habeas Corpus:** | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 894 Energy Allocation Act |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 895 Freedom of Information Act |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities- Employment | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities- Other | [ ] 550 Civil Rights | [ ] 463 Habeas Corpus - Alien Detainee | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition | [ ] 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C.§ 1332

Brief description of cause:
Complaint for declaratory relief

**VII. REQUESTED IN COMPLAINT:**

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

**VIII. RELATED CASE(S) IF ANY**

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)**
(PLACE AND "X" IN ONE BOX ONLY)

- [ ] SAN FRANCISCO/OAKLAND
- [X] SAN JOSE

DATE
April 1, 2008

SIGNATURE OF ATTORNEY OF RECORD

American LegalNet, Inc.
www.FormsWorkflow.com