1677.10859W

1   RANDALL E. WILLOUGHBY - 43177
        REW@wsblaw.net
2   ELLYN E.  NESBIT - 136398
        EEN@wsblaw.net
3   WILLOUGHBY, STUART & BENING, INC.
    50 W. San Fernando St., Suite 400
4   San Jose, California 95113
    (408) 289-1972
5   Facsimile: (408) 295-6375

6   Attorneys for Defendant/Counterclaimant
    Salinas Golf and Country Club, Inc.

7

8              IN THE UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11  PHILADELPHIA INDEMNITY          )   No.  C08 01773 JF
    INSURANCE COMPANY, a            )
12  Pennsylvania corporation,       )
                                    )
13                                  )   COUNTERCLAIM OF
                   Plaintiff,       )   SALINAS GOLF AND COUNTRY
14                                  )   CLUB, INC.
    vs.                             )
15                                  )
    SALINAS GOLF and COUNTRY        )   DEMAND FOR JURY TRIAL
16  CLUB, Inc., a California corporation )
    and RUSSELL BAAR, an individual )
17                                  )
                   Defendants.      )
18                                  )
                                    )
19  _____)
    SALINAS GOLF and COUNTRY        )
20  CLUB, Inc., a California corporation )
                                    )
21                                  )
                   Counterclaimant  )
22                                  )
    vs.                             )
23                                  )
    PHILADELPHIA INDEMNITY          )
24  INSURANCE COMPANY, a            )
    Pennsylvania corporation; and   )
25  UNITED STATES LIABILITY         )
    INSURANCE COMPANY, a            )
26  Pennsylvania corporation,       )
                                    )
27                 Counterdefendants. )
    _____)
28

Counterclaim                          1

Defendant/Counterclaimant SALINAS GOLF and COUNTRY CLUB, Inc.,

("SALINAS GOLF"), alleges as follows:

## NATURE OF THIS ACTION

1.      SALINAS GOLF asserts this Countercaim pursuant to Rule 13 and Rule 20 of

the F.R.C.P. in order to obtain, in the context of a single comprehensive proceeding, a

determination of the parties' rights and obligations under contracts of insurance issued to

SALINAS GOLF.

2.      Resolution of the parties' rights and obligations in regard to coverage owed to

SALINAS GOLF under the policies issued by Counterdefendants in a single comprehensive

proceeding is required in order to avoid the possibility of inconsistent judgments.

## PARTIES

3.      SALINAS GOLF is a California corporation with its principal place of

business in Monterey County, California.

4.      Plaintiff/Counterdefendant PHILADELPHIA INDEMNITY INSURANCE

COMPANY ("PHILADELPHIA INDEMNITY") is a Pennsylvania Corporation, which on

information and belief,  has its principal place of business in Bala Cynwyd, Pennsylvania.

5.      Counterdefendant UNITED STATES LIABILITY INSURANCE COMPANY

("USLI") is a Pennsylvania Corporation which on information and belief,  has its principal

place of business in Pennsylvania.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction of this Counterclaim pursuant to 28 U.S.C.

§1332(a) because Counterclaimant and Counterdefendants are citizens of different states,

and the matter in controversy exceeds $75,000 exclusive of interest and costs.   Supplemental

jurisdiction also exists under 28 U.S.C. §1367(a).

7.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) and (c) because a

substantial part of the events or omissions giving rise to this Counterclaim occurred in this

district, and all Counterdefendants are subject to personal jurisdiction in this district.

**INSURANCE POLICIES**

8.      PHILADELPHIA INDEMNITY issued a policy of insurance to SALINAS GOLF for the policy period of November 26, 2005 to November 26, 2006.  Exhibit A attached hereto is a copy of the policy which PHILADELPHIA INDEMNITY alleges in its complaint is a true and correct copy of the policy.

9.      USLI issued a policy of insurance to SALINAS GOLF for the policy period of November 26, 2004 to November 26, 2005.  On information and belief, Exhibit B attached hereto is a copy of the policy.

**FIRST CAUSE OF ACTION**
**(DECLARATORY RELIEF)**

10.      SALINAS GOLF alleges and reincorporates paragraphs 1 through 9 by reference as though fully set forth herein.

11.      On or about January 20, 2006, Robert Hedberg first filed suit against SALINAS GOLF and COUNTRY CLUB, Inc., by an Amended Complaint filed in Monterey Superior Court Case No. M77015.   Robert Hedberg was not named as a plaintiff in the original complaint filed by Christina Pitre.

12.       SALINAS GOLF tendered the Amended Complaint to Counterdefendants for defense and indemnity.

13.      USLI agreed to defend the entire amended complaint, including the claims made by Hedberg.   However, when Pitre settled her action against SALINAS GOLF, USLI withdrew its defense and thereafter refused to provide a defense to Hedberg's action.  USLI at all times denied any obligation to indemnify SALINAS GOLF with respect to Hedberg's action.

14.      USLI contends that it has no obligation to defend or indemnify Hedberg's action because Hedberg's claim against SALINAS GOLF was first made after its policy period.  USLI contends that allegations made in the original complaint forwarded by Pitre to

1   SALINAS GOLF within the USLI policy period did not constitute a claim by Hedberg.

2       15.    PHILADELPHIA INDEMNITY denied coverage for Hedberg's action on May

3   9, 2006.  It was not until March 19, 2008, that PHILADELPHIA INDEMNITY agreed to

4   defend, subject to a reservation of rights.

5       16.    PHILADELPHIA INDEMNITY contends that it has no duty to defend or

6   indemnify, and seeks reimbursement of defense expenses in its action for declaratory relief

7   against SALINAS GOLF.

8       17.    PHILADELPHIA INDEMNITY contends that despite the fact that Hedberg's

9   action was filed during its policy period, it has no duty to defend or indemnify because

10  Hedberg's claim is "interrelated" with Pitre's claim made prior to the policy period and that

11  Hedberg's claim is therefore deemed to have been made prior to the policy period.

12  PHILADELPHIA INDEMNITY contends that Hedberg's claim is excluded under a

13  "Notice/Claim Reporting Provision" and under a "Prior and Pending Exclusion".

14      18.    SALINAS GOLF contends that USLI,  PHILADELPHIA INDEMNITY, or

15  both insurers have a duty to defend and indemnify it with respect to Hedberg's action, and

16  that PHILADELPHIA INDEMNITY is not entitled to reimbursement of any sums from

17  SALINAS GOLF.

18      19.    An actual and present controversy has arisen, and now exists, between

19  PHILADELPHIA INDEMNITY, USLI, and SALINAS GOLF regarding the rights and

20  obligations of the parties under the policies.

21      20.    SALINAS GOLF has no adequate remedy at law, and therefore a judicial

22  determination is necessary and appropriate at this time so that the parties may ascertain their

23  respective rights and duties under the policies.

## SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT)

24
25      21.    SALINAS GOLF alleges and reincorporates paragraphs 1 through 20 by
26  reference as though fully set forth herein.
27      22.     SALINAS GOLF has paid all premiums due since the inception of the
28

1  policies, and has satisfied all of its contractual obligations and conditions precedent to

2  coverage under the policies.

3        23.    Hedberg's action potentially triggered coverage under the USLI and

4  PHILADELPHIA INDEMNITY policies, and Counterdefendants owed a duty to defend

5  SALINAS GOLF.

6        24.    The policies each contain a covenant of good faith and fair dealing, pursuant to

7  which Counterdefendants were obligated to pro-actively negotiate toward settlement and to

8  settle Hedberg's action against SALINAS GOLF.

9        25.    USLI breached its contractual obligations by withdrawing its defense of the

10 Hedberg action and by failing to take reasonable steps to settle the Hedberg action.

11       26.    PHILADELPHIA INDEMNITY breached its contractual obligations by

12 refusing to assume its defense obligation for two years, and by failing to take reasonable

13 steps to settle the Hedberg action.

14                        **THIRD CAUSE OF ACTION**
                    **(BREACH OF THE IMPLIED COVENANT OF**
15                     **GOOD FAITH AND FAIR DEALING)**

16       26.    SALINAS GOLF alleges and reincorporates paragraphs 1 through 25 by

17 reference as though fully set forth herein.

18       27.    The policies of insurance issued by Counterdefendants to SALINAS GOLF

19 each included, as an implied-in-law provision, an obligation that Counterdefendants act in

20 good faith and with fair dealing in respect to the manner in which they handled claims under

21 their respective policies, and to refrain from taking any action which would deprive their

22 insureds of the benefit of the insurance provided under their policies.

23       28.    Counterdefendants breached the implied covenant of good faith and fair

24 dealing and continue to engage in a course of conduct in violation of their good faith

25 obligations, including but not limited to the following respects:

26              a.  PHILADELPHIA INDEMNITY unreasonably refused to defend

27                   Hedberg's action for two years, and unreasonably denied its duty to

28                   indemnify.

Counterclaim                                5

b. PHILADELPHIA INDEMNITY  failed to conduct a prompt, thorough, impartial and complete investigation to determine whether Hedberg's action was subject to defense and indemnity or potentially could be subject to defense and indemnity under its policy;

c. PHILADELPHIA INDEMNITY unreasonably failed to negotiate toward settlement and to settle Hedberg's action against SALINAS GOLF.

d. USLI failed to disclose the conflict of interest created by its reservation of rights letter agreeing to defend the entire complaint, while denying any indemnity obligation with respect to Hedberg's action;

e. USLI failed to inform SALINAS GOLF of its right to independent counsel as a result of the conflict of interest, and USLI failed to provide independent counsel to SALINAS GOLF;

f. USLI tortiously breached its obligation to act in good faith and fair dealing by withdrawing its defense without proper cause.  The allegations in the Hedberg action were sufficient to establish a potential for coverage and, therefore, that USLI had a duty to defend SALINAS GOLF in Hedberg's action.

g. USLI failed to conduct a prompt, thorough, impartial and complete investigation to determine whether Hedberg's action was subject to defense and indemnity or potentially could be subject to defense and indemnity under its policy;

h. USLI unreasonably failed to negotiate toward settlement and to settle Hedberg's action against SALINAS GOLF.

29. As a direct, legal, and proximate result of Counterdefendants' breach of their obligations, SALINAS GOLF has suffered economic and consequential damages in an amount to be shown at trial.   SALINAS GOLF was also required to retain legal counsel to prosecute this action to recover benefits rightfully due under its contracts of insurance with

1  Counterdefendants.

2       30.    Counterdefendants' conduct alleged herein was done with fraud, malice, and

3  oppression as defined by Civil Code § 3294 in that the conduct was intended to annoy,

4  harass, and injure SALINAS GOLF, and was carried out with a willful, conscious and

5  reckless disregard of SALINAS GOLF'S rights and the impact such conduct would have

6  upon SALINAS GOLF.  Therefore, SALINAS GOLF is entitled to punitive damages from

7  Counterdefendants pursuant to Civil Code § 3294 in an amount to be shown according to

8  proof at the time of trial in order to punish and deter Counterdefendants from engaging in

9  such acts against SALINAS GOLF and other policyholders similarly situated.

10

11  **WHEREFORE** SALINAS GOLF prays for judgment as follows:

12       a.    For a judgment declaring that PHILADELPHIA INDEMNITY is and has been

13             obligated to defend SALINAS GOLF in the Hedberg action, and that

14             PHILADELPHIA INDEMNITY is not entitled to reimbursement from

15             SALINAS GOLF of any defense expenses paid.

16       b.    For a judgment declaring that USLI is and has been obligated to defend

17             SALINAS GOLF in the Hedberg action.

18       c.    For a judgment declaring that PHILADELPHIA INDEMNITY is

19             obligated to indemnify SALINAS GOLF in the Hedberg action.

20       d.    For a judgment declaring that USLI is obligated to indemnify SALINAS

21             GOLF in the Hedberg action.

22       e.    For all policy benefits withheld plus interest at the legal rate thereon, as well

23             as special, general, economic, incidental, and consequential damages,

24             according to proof;

25       f.    For prejudgment interest;

26       g.    For attorneys fees and costs of suit incurred herein;

27       h.    For punitive damages;

28       i.    For such other and further relief as the Court may deem just and proper.

Counterclaim                          7

1    DATED: June 4, 2008                    WILLOUGHBY, STUART & BENING

2

3                                          By: _____

4                                                ELLYN E. NESBIT
                                                 Attorneys for Counterclaimant/Plaintiff

5

6

7

8

9

10                          **DEMAND FOR JURY TRIAL**

11

12          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, defendant Salinas Golf and

    Country Club, Inc. hereby demands a trial by jury on its Counterclaim.

13

14   DATED: June 4, 2008                    WILLOUGHBY, STUART & BENING

15

16                                          By: _____/s/_____

17                                                ELLYN E. NESBIT
                                                 Attorneys for Counterclaimant/Plaintiff

18

19

20

21

22

23

24

25

26

27

28

Counterclaim                              8

**EXHIBIT A**

PI-NPD-1 (01-02)

**Philadelphia Indemnity Insurance Company**
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900    Fax:  610.617.7940

**FLEXIPLUS FIVE**
NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE
WORKPLACE VIOLENCE INSURANCE
INTERNET LIABILITY INSURANCE

Policy Number:  PHSD165265

DECLARATIONS

NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY
IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE
DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO
THE TERMS HEREIN.  THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED
AGAINST THE RETENTION.

Item    1.    Parent Organization and Address:
SALINAS GOLF & COUNTRY CLUB
PO Box 4277
Salinas, CA 93912-4277


Internet Address: www. salinascountryclub.com


Item    2.    Policy Period:    From: 11/26/2005  To: 11/26/2006
(12:01 A.M. local time at the address shown in Item 1.)

Item    3.    Limits of Liability:

| | | | |
|---|---|---|---|
| (A) | Part 1, D&O Liability: | $  1,000,000 | each Policy Period. |
| (B) | Part 2, Employment Practices: | $  1,000,000 | each Policy Period. |
| (C) | Part 3, Fiduciary Liability: | $ | each Policy Period. |
| (D) | Part 4, Workplace Violence: | $ | each Policy Period. |
| (E) | Part 5, Internet Liability: | $ | each Policy Period. |
| (F) | Aggregate, All Parts: | $  2,000,000 | each Policy Period. |

Item    4.    Retention:

| | | | |
|---|---|---|---|
| (A) | Part 1, D&O Liability: | $  5,000 | for each Claim under Insuring Agreement B & C. |
| (B) | Part 2, Employment Practices: | $  5,000 | for each Claim. |
| (C) | Part 3, Fiduciary Liability: | $ | for each Claim. |
| (D) | Part 4, Workplace Violence: | $ | for each Workplace Violence Act. |
| (E) | Part 5, Internet Liability: | $ | for each Claim. |

EXHIBIT A

PI-NPD-1 (01-02)

Item 5.    Prior and Pending Date: Part 1    11/26/2005    Part 2    11/26/2005
Part 3  No Date Applies  Part 4  No Date Applies
Part 5  No Date Applies

Item 6.    Premium:    Part 1 $  1,285.00    Part 2 $   531.00    Part 3
Part 4    Part 5

Total Premium: $  1,816.00

Item 7.    Endorsements: PER SCHEDULE ATTACHED

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

_____    _____    _____
Authorized Representative     Countersignature     Countersignature Date

Philadelphia Indemnity Insurance Company

Form Schedule -- Flexi Plus Five

**Policy Number:** PHSD165265

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-NPD-1 | 0102 | FlexiPlus Five Declarations Page |
| PI-NPD-2 | 0102 | Flexi Plus Five Policy |
| PI-NPD-25 | 0102 | Professional Services Exclusion(Supervision Carve-Out) |
| PI-NPD-44 | 0102 | Third Party EPLI Exclusion |
| PI-NPD-52 | 1203 | Amendment of Exclusions |
| PI-SLD-001 | 0103 | Cap on Losses from Certified Acts of Terrorism |
| PI-PL-CA | 0198 | California Amendatory Endorsement |

PP-0701 07-01

# PHILADELPHIA INSURANCE COMPANIES

## PRIVACY POLICY NOTICE

### Philadelphia Insurance Company & Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies values your privacy and we are committed to protecting personal information that we collect during the course of our business relationship.

The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information we collect and how it may be disclosed. This does not reflect a change in the way we do business or handle your information.

**Information We Collect:**

We collect personal information about you from the following sources:
- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

**Information We Disclose:**

We will only disclose the information described above, as permitted by law, to our affiliates and non-affiliated third parties when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:
- Your agent or broker;
- Parties who perform a business, professional or insurance function for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, other insurers, medical care institutions and attorneys who need the information to investigate, defend or settle a claim involving you;
- Insurance regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes.
We do not disclose the personal information of persons who have ceased to be our customers.

**Protection of Information:**

The Philadelphia Insurance Companies maintains physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

**How to Contact Us:**

Feel free to call or write to us for additional information.

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
(877)-438-7459

POLICY NUMBER: PHSD165265                                    IL 09 85 01 03

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT OF 2002

**SCHEDULE\***

| |
|---|
| Terrorism Premium (Certified Acts)<br>$ 0<br><br><br>Additional information, if any, concerning the terrorism premium:<br><br><br><br><br><br><br><br><br><br> |

\*    Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act of 2002, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

Case 5:08-cv-01773-HRL   Document 1-2   Filed 04/02/2008   Page 6 of 35

PI-NPD-2 (1-02)

FLEXI PLUS FIVE
NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE
WORKPLACE VIOLENCE INSURANCE
INTERNET LIABILITY INSURANCE

**EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS IS A CLAIMS MADE POLICY.**

**CLAIMS MADE POLICIES ONLY COVER THOSE CLAIMS MADE AGAINST THE INSURED DURING THE POLICY PERIOD.**

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

### Part 1
Not-for-Profit Organization Directors & Officers Liability Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.    INSURING AGREEMENTS

    A.   The **Underwriter** will pay on behalf of the **Individual Insured, Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Organization** has indemnified the **Individual Insureds** for such **Loss**.

    B.   The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Organization** has indemnified such **Individual Insureds** for such **Loss**.

    C.   The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period) and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II.   DEFINITIONS

    A.   **D&O Wrongful Act** means any actual or alleged:

        1.   act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or by the **Organization**; or

        2.   act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** while serving as a director, officer, governor or trustee of any **Outside Entity**, if such service is at the written request or direction of the **Organization**.

However, **D&O Wrongful Act** does not include an **Employment Practice Act**, **Fiduciary Liability Act**, or **Internet Liability Act**.

B. **Outside Entity** means:

1. any not-for-profit entity described in section 501(c) of the Internal Revenue Code of 1986 (as amended); or

2. any other entity listed as an **Outside Entity** in an endorsement to this Policy.

C. **Personal & Advertising Injury** means any actual or alleged:

1. false arrest, detention or imprisonment, or malicious prosecution; or

2. oral or written publication of material that slanders or libels a person or entity or disparages a person's or entity's goods, products or services; or

3. oral or written publication of material that violates a person's right of privacy; or

4. wrongful eviction or entry or other invasion of the right of privacy; or

5. misappropriation of advertising ideas, unauthorized use of title or slogan, or plagiarism; or

6. infringement of copyright or trademark.


III. **EXCLUSIONS**

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

A. arising out of, based upon or attributable to any actual or alleged infringement of any patent or misappropriation of trade secrets;

B. arising out of, based upon or attributable to any actual or alleged:

1. publication or utterance of material by or at the direction of such **Insured** with knowledge of its falsity; or

2. composing, editing, designing, publishing, distributing or printing periodicals, advertisements or other materials by the **Insured** for another party if such activity is not in connection with and not a regular part of the **Insured's** own publications; or

3. failure of goods, products or services to conform with advertised quality or performance; or

4. wrong description of the price of goods, products or services;

C. arising out of, based upon or attributable to any actual or alleged breach of contract or agreement. However, this exclusion shall not apply to the following:

PI-NPD-2 (1-02)

     1.  liability of the **Insured** which would have attached even in the absence of such ontract or agreement; or

     2.  **Defense Cost.**

IV.   PRESUMPTIVE INDEMNIFICATION

If the **Organization** is permitted or required by common or statutory law, but fails to indemnify the **Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention amount set forth in Item 4(A) of the Declarations Page. The charter, by-laws, shareholder and board of director's resolutions of the **Organization** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

## Part 2
## Employment Practices Liability Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.   INSURING AGREEMENTS

   A.  The **Underwriter** will pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practices Act.**

II.   DEFINITIONS

   A.  **Employment Practice Act** means any actual or alleged:

     1.  wrongful dismissal, discharge or termination of employment;

     2.  breach of a written or oral employment contract or implied employment contract;

     3.  employment related misrepresentation;

     4.  wrongful failure to promote;

     5.  violation of employment discrimination laws (including harassment);

     6.  wrongful deprivation of a career opportunity;

     7.  employment related wrongful discipline;

     8.  negligent employee evaluation;

     9.  employment related invasion of privacy;

     10. employment related defamation (including libel and slander);

     11. sexual or workplace harassment of any kind;

PI-NPD-2 (1-02)

12. constructive discharge of employment;

13. employment related retaliation;

14. employment related humiliation;

15. wrongful demotion;

16. negligent reassignment;

17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Act** means any actual or alleged wrongful failure to employ, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

However, **Employment Practices Act** does not include a **D&O Wrongful Act**, **Fiduciary Liability Act**, or **Internet Liability Act**.

B. **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Organization**.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to any failure to comply with any law concerning Workers Compensation, Unemployment Insurance, Social Security, Disability Benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above laws;

B. arising out of, based upon or attributable to any violation of any of the responsibilities, obligations, or duties imposed by the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above statute, law, rule, regulation or order;

C. arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements;

PI-NPD-2 (1-02)

D.  arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment,  or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

   1.  liability of the **Organization** which would have attached even in the absence of such contract or agreement; or

   2.  **Defense Costs.**

E.  to the extent such **Loss** constitutes employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay.


## Part 3
## Fiduciary Liability Insurance

(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.  **INSURING AGREEMENTS**

   A.  The **Underwriter** will pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act.**

II.  **DEFINITIONS**

   A.  **Administration** means:  (i) giving counsel to employees, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of employees or participants under any **Benefit Plan.**

   B.  **Benefit Plan** means:

   1.  any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Organization** solely for the benefit of the employees of the **Organization**;

   2.  any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Organization** solely for the benefit of the employees of the **Organization**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

   3.  any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the employees of the **Organization**; but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice

PI-NPD-2 (1-02)

to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

4.  any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for employees of the **Organization**.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

However, **Benefit Plan** does not include any multi-employer plan.

C.  **Fiduciary Liability Act** means any actual or alleged:

1.  breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by ERISA; or

2.  negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

However, **Fiduciary Liability Act** does not include a **D&O Wrongful Act** or an **Internet Liability Act**.

D.  **Pension Benefit Plan** means any employee pension benefit plan, as defined in ERISA.

E.  **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in ERISA.

III.  EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.  arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B.  to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C.  arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D.  arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

PI-NPD-2 (1-02)

# Part 4
## Workplace Violence Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.    INSURING AGREEMENTS

    A.    The **Underwriter** will pay on behalf of the **Organization** any **Violence Damage**, resulting from a **Workplace Violence Act** occurring during the **Policy Period** and reported to the **Underwriter** pursuant to the terms of this Policy.

II.   DEFINITIONS

    A.    **Violence Damage** means:

        1.    **Business Interruption Expense**

        2.    **Public Image Restoration Expense**

        3.    **Workplace Violence Expense**

    B.    **Business Interruption Expense** means the amount calculated as set forth below for a period of time commencing on the day the **Workplace Violence Act** occurs until the earlier of ninety (90) days following such date, or until the **Organization** restores operations with due diligence and dispatch to the level that existed prior to the **Workplace Violence Act**:

        1.    The sum of:

            a.    net profits before income taxes that would have been earned had no **Workplace Violence Act** occurred; and

            b.    the actual cost of continuing the activities which are necessary for the **Organization** to resume operations with substantially the same quality of service which existed immediately preceding the **Workplace Violence Act**; and

            c.    reasonable expenses which would not have been incurred except for such **Workplace Violence Act** and which were incurred by the **Organization** for the sole purpose of reducing **Business Interruption Expense** described in B.1. (a or b) above, not to exceed the amount of actual reduction of such **Business Interruption Expense**; and

        2.    Less the sum of:

            a.    all recoveries, other insurance, suretyship and other indemnity which cover **Business Interruption Expense** described in B.1. above; and

            b.    the amount by which the **Organization** reasonably could have but fails to reduce **Business Interruption Expense** described in B.1. above.

PI-NPD-2 (1-02)

C. **Public Image Restoration Expense** means reasonable fees and expenses for, or cost of:

1. an independent public relations consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

2. an independent security consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

3. a counseling seminar for **Individual Insureds** conducted by an independent consultant following the **Workplace Violence Act**;

4. independent security guard service for up to thirty (30) days following the date the **Workplace Violence Act** occurs;

5. an independent forensic analyst for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

D. **Workplace Violence Expense** means the reasonable fees and expenses for, or cost of:

1. the **Salary or Wages**, for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays **Individual Insureds** victimized by **Workplace Violence Acts** and unable to continue to work because of such **Workplace Violence Acts**. The **Salary or Wages** in effect at the time of the **Workplace Violence Act** shall apply.

2. the **Salary or Wage**, for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays a newly hired person(s) to conduct the duties of **Individual Insureds** victimized by **Workplace Violence Acts** and who is/are unable to continue to work because of such **Workplace Violence Acts**; however such **Salary or Wage** shall not exceed the **Salary or Wage** of the victimized **Individual Insured** in effect at the time of the **Workplace Violence Act**.

E. **Workplace Violence Act** means any actual or alleged intentional and unlawful use of, or threat to use, deadly force with an intent to cause harm at the **Premises**.

F. **Premises** means any building, facility or property occupied by the **Organization** in conducting its operations.

G. **Salary or Wage** means compensation the **Organization** pays an **Individual Insured**, including but not limited to bonus, commission, incentive payments, and the cost of health, welfare and pension benefits.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 4 to make any payment for **Violence Damage**:

A. arising out of, based upon or attributable to war, invasion, insurrection, riot, rebellion, revolution, civil war, or military action;

PI-NPD-2 (1-02)

B.  arising out of, based upon or attributable to a **Workplace Violence Act** which occurs at any location other than the **Premises**;

C.  arising out of, based upon or attributable to the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property.

D.  arising out of, based upon or attributable to a **Workplace Violence Act** occurring prior to the Prior and Pending Date shown in Item 5 of the Declarations Page.

## Part 5
## Internet Liability Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.   INSURING AGREEMENTS

A.  The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Internet Liability Act**.

II.  DEFINITIONS

A.  **Internet Activity** means any display, transmission, dissemination, or other use of **Matter** on an **Internet Site**.

B.  **Internet Site** means the internet address(es) shown in Item 1 of the Declarations Page.

C.  **Matter** means printed, verbal, numerical, audio or visual expression, or any other expression, regardless of the medium upon which such expression is fixed.

D.  **Product** means any tangible property offered for sale or otherwise disseminated by or through any **Insured.**

E.  **Internet Liability Act** means any actual or alleged act, error, or omission committed or attempted by an **Insured** in their capacity as an **Insured** solely in connection with **Internet Activity** by or on behalf of the **Organization**, including:

1.  libel, slander, or oral or written publication of defamatory or disparaging material; or

2.  invasion of or interference with the right of privacy; or

3.  infringement of copyright, service mark, trademark, trade dress or trade name or title or slogan or improper use of literary or artistic titles, formats or performances.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 5 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.  arising out of, based upon or attributable to any actual or alleged price fixing, restraint

of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto; or any rules and regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

B.  arising out of, based upon or attributable to any actual or alleged breach of contract or agreement, or for liability assumed by the **Organization** under a contract or agreement; however, this exclusion shall not apply to any of the following:

1.  liability of the **Organization** which would have attached even in the absence of such contract or agreement;

2.  **Defense Cost;**

C.  arising out of, based upon or attributable to any actual or alleged:

1.  wrong description of the price or authenticity of an **Product;** or

2.  failure of any **Product** to conform with advertised quality or performance; or

3.  sale or offer for sale of any **Product** that infringes upon the name, design or logo of another entity's **Product;**

D.  arising out of, based upon or attributable to any actual or alleged infringement of any patent or misappropriation of trade secrets;

E.  to the extent such **Loss** constitutes amounts charged to or due from clients or customers of the **Organization**, or the value of any electronic fund transfer or transaction by or on behalf of the **Organization** which is lost or damaged during transfer into, from or between **Organization** accounts;

F.  brought or maintained by or on behalf of any federal, state, or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulations;

G.  arising out of, based upon or attributable to the development, distribution, dissemination, installation, implementation, operation, maintenance and/or filtering software, or of policies, equipment or procedures for establishing or managing a secure method for exchanging electronic information;

H.  arising out of, based upon or attributable to any costs, expenses or other payment incurred by the insured or others in connection with the withdrawal or recall from the marketplace of the **Insured's Products**, including other products which incorporated the **Insured's Products;**

I.  arising out of, based upon or attributable to coupons, price discounts, prizes, awards, or any any other valuable consideration given in excess of the total contracted or expected amount;

J.  (i) a computer virus, (ii) the unauthorized access to or use of a computer, computer system or computer network, or (iii) the inability of an authorized **Third Party** to access

PI-NPD-2 (1-02)

services provided by the **Organization** through the **Internet Site**.

## Part 6
## Common Policy Definitions

A. **Application** means:

   1. the **Application** for this Policy, including any material submitted therewith; and

   2. the **Application(s)**, including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

   all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means for the purposes of Parts 1, 2, 3, and 5:

   1. any written demand for monetary or non-monetary relief; or

   2. any judicial, civil, administrative, regulatory, or arbitration proceeding (including any appeal therefrom), which subjects an **Insured** to a binding adjudication of liability for monetary or non-monetary relief for a **Wrongful Act**; or

   3. any written request to toll or waive any statute of limitations applicable to any actual or potential suit or cause of action against an **Insured**.

   However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

C. **Damage** means a monetary judgement, award or settlement including punitive, exemplary or multiple portion thereof, or, with respect to Part 4 (Workplace Violence Insurance), **Violence Damage**.

D. **Defense Cost** means:

   1. any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim**, except that **Defense Cost** shall not include:

      a. any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

      b. salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2 below; or

      c. salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**.

   2. a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured**

PI-NPD-2 (1-02)

at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E.  **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

F.  **Individual Insured** means:

    1.  any individual who has been, now is or shall become a director, officer, governor, trustee, equivalent executive, employee (whether salaried or not), volunteer, leased or temporary employee, or committee member of the **Organization** or, solely with respect to Part 3 (Fiduciary Liability Insurance), of any **Benefit Plan**;

    2.  the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Organization**, but only for actual or alleged **Wrongful Acts** of such executive for which such spouse may be liable as the spouse of such executive.

    3.  the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in (1) above which, in the absence of such death or incompetence, would have been covered by this Policy;

    4.  with respect to an **Organization** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Organization** that is equivalent to any position described in (1) above.

G.  **Insured** means the **Organization** and **Individual Insured.**

H.  **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts.**

I.  **Loss** means:

    1.  **Damages;**

    2.  **Defense Cost;**

but **Loss** does not include:

    1.  criminal or civil fines or penalties imposed by law; except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or

    2.  taxes; or

    3.  matters deemed uninsurable under the law to which this Policy shall be construed; or

    4.  any amounts other than **Defense Cost**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

    5.  any costs other than **Defense Cost** associated with any accommodation required

PI-NPD-2 (1-02)

pursuant to the American With Disabilities Act, the Civil Rights Act of 1964, rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

J.  **Organization** means:

1.  the **Parent Organization**,

2.  any **Subsidiary**, and

3.  solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

K.  **Parent Organization** means the first entity named in Item 1 of the Declarations Page.

L.  **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

M.  **Subsidiary** means:

1.  any not-for-profit entity for which, on or before the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, provided such entity is identified as a **Subsidiary** in the **Application**;

2.  any not-for-profit entity for which, after the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total less than 35% of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period**. The **Parent Organization** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

3.  any not-for-profit entity for which, after the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total 35% or more of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period**; but only upon the condition that before the end of the **Policy Period** or within 90 days from having the right to elect or select a majority of the directors or trustees, whichever is lesser, the **Parent Organization** shall have provided the **Underwriter** with full particulars and agreed to any additional premium and/or amendment of the provisions of this Policy.

4.  any for profit entity or the directors, officers, or trustees of a for profit entity for which, the **Underwriter**, at its sole discretion, agrees by written endorsement to provide coverage upon such terms or additional premium charged.

Further, coverage as shall be afforded by paragraphs 3 and 4 above is conditioned upon the **Parent Organization** paying when due any applicable additional premium required by the **Underwriter** relating to such new **Subsidiary**.

N.  **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

PI-NPD-2 (1-02)

O. **Wrongful Act** means:

   1.  with respect to Part 1, any **D&O Wrongful Act**,

   2.  with respect to Part 2, any **Employment Practices Act**,

   3.  with respect to Part 3, any **Fiduciary Liability Act**,

   4.  with respect to Part 5, any **Internet Liability Act**

## Part 7
## Common Policy Exclusions

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.  arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission.

B.  arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission.   This exclusion shall not apply to a **Workplace Violence Act** under Part 4 (Workplace Violence Insurance);

No **Wrongful Act** of any **Insured** shall be imputed to any **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C.  arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D.  arising out of, based upon or attributable to any bodily injury or property damage regarding tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E.  arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and ByProduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

PI-NPD-2 (1-02)

F.  arising out of, based upon or attributable to:

    1.  any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

    2.  any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

    1.  any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G.  arising out of, based upon or attributable to the insolvency, conservatorship, receivership,    bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.  to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.  for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to Part 4 (Workplace Violence Insurance) or to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.  brought  or maintained by, at the behest, or on behalf of the **Organization**;

K.  for any actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA**; however, this exclusion shall not apply to Part 3 (Fiduciary Liability Insurance);

L.  for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.  for service by the **Individual Insured** in any position or capacity in any entity other than the **Organization**, a **Benefit Plan** or an **Outside Entity**, even if the **Organization** directed or requested the **Individual Insured** to serve in such other position or capacity.

PI-NPD-2 (1-02)

## Part 8
### Common Policy Conditions

I.   LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made or **Workplace Violence Acts** committed, the **Underwriter's** liability under the Policy is limited as follows:

A.   With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Damages** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3(A) of the Declarations.

B.   With respect to coverage under Part 2, Part 3, Part 4, or Part 5 of this Policy, the **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** made, and all **Workplace Violence Acts** taking place, during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3(B), 3(C), 3(D) or 3(E), respectively, of the Declarations.

C.   The **Underwriter's** maximum aggregate liability for all **Damage** on account of all **Claims** first made, and all **Workplace Violence Acts** taking place, during the **Policy Period** under all purchased **Parts**, combined, shall be the Aggregate Limit of Liability set forth in Item 3(F) of the Declarations. The Limits of Liability set forth in Item 3(A), 3(B), 3(C), 3(D) and 3(E) are sub-limits which do not increase the **Underwriter's** maximum liability as set forth in Item 3(F).

D.   **Defense Cost** is in addition to and is not part of the Limit of Liability specified in Item 3 of the Declarations. Payment by the **Underwriter** of **Defense Cost** incurred on account of any **Claim** shall not serve to reduce the Limit of Liability stated in Item 3 of the Declarations, but the **Underwriter** is not obligated to pay any **Defense Cost** after the applicable Limit of Liability has been exhausted by payment of **Damages**.

E.   The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II.  RETENTION CLAUSE

A.   The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** or **Workplace Violence Act** which is in excess of the respective Retention stated in Item 4 of the Declarations Page. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Organization** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts** and all related **Workplace Violence Acts**.

III. DEFENSE AND SETTLEMENT

A.   The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim**. However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**. Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the

PI-NPD-2 (1-02)

provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

B. If the **Insured** has assumed the defense of a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Cost** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Defense Cost** incurred, settlements made or judgements admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.

C. The **Underwriter** may investigate and, with the consent of the **Insured**, settle any **Claim** or **Workplace Violence Act** as the **Underwriter** deems expedient, but the **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D. In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall take reasonable measures to protect their interests.

E. If more than one **Insured** is involved in a **Claim**, the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds.**

F. The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** or a **Workplace Violence Act**, the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Cost** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4 of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability which is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4 of the Declarations Page, even if consent is given to a subsequent settlement.

PI-NPD-2 (1-02)

IV.    NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.    In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice of such **Claim** or **Workplace Violence Act** as soon as practicable to the **Underwriter** during this **Policy Period**, or, if applicable, during any Extension Period, but, not later than 60 days after the expiration date of this Policy or any Extension Period, if applicable.

B.    If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to the **Wrongful Act**, dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.    All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts**, or the same or related **Workplace Violence Acts**, shall be deemed one **Loss** on account of a one **Claim** or one **Workplace Violence Act**. Such **Claim** or **Workplace Violence Act** shall be deemed to be first made or to have first occurred when the earliest of such **Claims** or **Workplace Violence Acts** were first made or first occurred.

V.    CANCELLATION AND NON RENEWAL

A.    The **Underwriter** may not cancel this Policy except for failure to pay premium when due, in which case 10 days written notice shall be given to the **Parent Organization** for such cancellation to be effective.

B.    The **Parent Organization** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Parent Organization** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C.    The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be sent to the **Parent Organization** at least 30 days prior to expiration of the **Policy Period**.

PI-NPD-2 (1-02)

VI.   REPRESENTATIONS AND SEVERABILITY

A.   The **Insured** represent that the particulars and statements contained in the
**Application** are true and agree that (1) those particulars and statements are the basis
of this Policy and are to be considered as incorporated into and constituting a part of
this Policy; (2) those particulars and statements are material to the acceptance of the
risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in
reliance upon the truth of such representations.

B.   Except for material facts or circumstances known to the **Individual Insured** signing the
**Application**, no statement in the **Application** or knowledge or information possessed
by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of
determining the availability of coverage.

VII.   SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the
extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall
execute and deliver such instruments and papers and do whatever else is necessary to
secure such rights and shall do nothing to prejudice or compromise such rights without the
**Underwriter's** express written consent.

VIII.   EXTENSION PERIOD

A.   If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the
coverage granted under Part 1, 2, 3, and 5 of this Policy for any **Claim** first made
against the **Insured** during the 60 days after the non-renewal date, but only with
respect to any **Wrongful Act** committed before such non-renewal date and otherwise
covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not
apply if the **Insured** has purchased similar insurance from the **Underwriter** or any
other insurer covering such **Claim**.

Upon expiration of the Automatic Extension, the **Parent Organization** shall have the
right, upon payment of an additional 50%, 75%, 100% of this Policy's annual premium
to an extension of the coverage granted by this Policy for any **Claim** first made against
the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36)
months, respectively, after the expiration of the Automatic Extension, but only with
respect to **Wrongful Acts** committed before the non-renewal date and otherwise
covered by this Policy (the "Extension Period"); provided however, that the request for
this Extension Period must be made to the **Underwriter** in writing and payment of the
additional premium must be made prior to the expiration of the Automatic Extension. In
the event similar insurance is in force covering any **Claims** first made during this
Extension Period, coverage provided by this Policy shall be excess over any such other
insurance.

B.   If the **Parent Organization** cancels or does not renew this Policy or the **Underwriter**
cancels for nonpayment of premium, the following will apply:

The **Parent Organization** shall have the right, upon payment of an additional 50%,
75%, or 100% of this Policy's annual premium, to an extension of the cover granted
under Parts 1, 2, 3 and 5 of this Policy for any **Claim** first made against the **Insured**

PI-NPD-2 (1-02)

during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C. All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX.    CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** or **Workplace Violence Act**, except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X.     ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI.    AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Parent Organization** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Parent Organization** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Parent Organization** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Parent Organization** shall be the agent of any **Insured** to effect changes in this Policy.

XII.   OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** or **Workplace Violence Acts** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

PI-NPD-2 (1-02)

XIII.  TERMS OF POLICY CONFORMED TO STATUTE

Terms of this Policy which are in conflict with the statutes of any state in which this Policy is issued are hereby amended to conform to such statutes.

XIV.  ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XV.  ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.  No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.  Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XVI.  CHANGE IN OWNERSHIP OR CONTROL

A.  If after the inception of the **Policy Period**:

1.  the **Organization** merges into or consolidates with another entity such that the other entity is the surviving entity; or

2.  another entity or person or group of entities and/or persons acting in concert acquires more than fifty percent (50%) of the assets of the **Organization**; or

3.  another entity or person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of the **Organization's** directors or trustees;

(1., 2., and 3. above hereinafter referred to as the "Merger"), then coverage under Parts 1, 2, 3, and 5 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** (or the Extension Period, if purchased) for a **Wrongful Acts** committed prior to the effective date of the Merger and only if the following conditions are met:

1.  the **Insured** provides written notice of the Merger to the **Underwriter** within 45 days of the effective date of such Merger; and

2.  the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary.

PI-NPD-2 (1-02)

If **Insured** fails to meet conditions 1. & 2. above, this Policy shall be deemed cancelled by the **Underwriter** as of the effective date of the Merger and the **Underwriter** shall return any unearned premium on a pro-rata basis. The **Insured** shall have the right to purchase the Extension Period.

Coverage under Part 4 of this Policy shall cease with respect to any **Workplace Violence Act** occurring after the effective date of the Merger.

B.   If after the inception of the **Policy Period**:

    1.    the **Organization** acquires or assumes more than fifty percent (50%) of the assets, liabilities, or equity of, or merges with any for profit entity or creates a for-profit subsidiary, no coverage shall be afforded under this Policy for **Claims** arising out of, based upon or attributable to such transaction unless all of the following conditions are met:

        a.    the **Underwriter** receives from the **Parent Organization** full details of such transaction; and

        b.    the **Underwriter**, at its sole discretion, agrees by written endorsement to this Policy to provide coverage to the for-profit entity upon such terms, conditions and limitations as it may require.

## XVII.  TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed or any **Workplace Violence Act** occurring anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgement is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgement is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

## XVIII.  TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Parent Organization** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim** or **Workplace Violence Act.** Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Parent Organization** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act, Workplace Violence Act,** professional incident, occurrence, offense, accident or **Loss,** then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

## XIX.  ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Organization,** and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss. Any such allocation

PI-NPD-2 (1-02)

shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

IN WITNESS WHEREOF, the **Underwriter** has caused this Policy to be signed by its President and Secretary, but the same shall not be binding upon the **Underwriter** unless countersigned by an authorized representative of the **Underwriter**.


Secretary                                      President

PI-NPD-25 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PROFESSIONAL SERVICES EXCLUSION (SUPERVISION CARVE-OUT)

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

Provided, however, that the foregoing shall not be applicable to any derivative action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

PI-NPD-44 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## THIRD PARTY EPLI EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part 2, Section II. DEFINITIONS, A. **Employment Practice Act** is amended to read:

A.   **Employment Practice Act** means any actual or alleged:

  1.     wrongful dismissal, discharge or termination of employment;

  2.     breach of a written or oral employment contract or implied employment contract;

  3.     employment related misrepresentation;

  4.     wrongful failure to promote;

  5.     violation of employment discrimination laws (including harassment);

  6.     wrongful deprivation of a career opportunity;

  7.     employment related wrongful discipline;

  8.     negligent employee evaluation;

  9.     employment related invasion of privacy;

  10.    employment related defamation (including libel and slander);

  11.    sexual or workplace harassment of any kind;

  12.    constructive discharge of employment;

  13.    employment related retaliation;

  14.    employment related humiliation;

  15.    wrongful demotion;

  16.    negligent reassignment;

  17.    violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

However, **Employment Practices Act** does not include a **D&O Wrongful Act, Fiduciary Liability Act**, or **Internet Liability Act**.
It is further agreed, Section III. EXCLUSIONS, is amended to include:

which is brought by or made on behalf of any **Third Party**.

PI-NPD-52 (12/03)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

With regard to Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for retaliation; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for Retaliation; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 6 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

PI-SLD-001 (01/03)

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

# PROFESSIONAL LIABILITY

## *DIRECTORS AND OFFICERS LIABILITY*

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Includes copyrighted material of the Insurance Services Office, Inc., used with its permission.

PI-PL-CA (1/98)

## THIS ENDORSMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CALIFORNIA AMENDATORY ENDORSEMENT

To be attached to and form a part of all policies written in California.

In consideration of the premium charged, it is understood and agreed that:

The CANCELLATION AND NONRENEWAL POLICY CONDITIONS is hereby deleted and replaced with the following:

A.  Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. All Policies In Effect For 60 Days Or Less

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

a. 10 days before the effective date of cancellation if we cancel for:

(1) Nonpayment of premium; or

(2) Discovery of fraud or material misrepresentation by:

(a) Any insured or his or her representative in obtaining this insurance; or

(b) You or your representative in pursuing a claim under this policy.

b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. All Policies In Effect For More Than 60 Days

a. If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

(1) Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

(2) Discovery of fraud or material misrepresentation by:

(a) Any insured or his or her representative in obtaining this insurance; or

(b) You or your representative in pursuing a claim under this policy.

(3) A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

PI-PL-CA (1/98)

(4) Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

(5) Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

(6) A determination by the Commissioner of Insurance that the:

(a) Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

(b) Continuation of the policy coverage would:

(1) Place us in violation of California law or the laws of the state where we are domiciled; or

(2) Threaten our solvency.

(7) A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

(a) We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

(1) 10 days before the effective date of cancellation if we cancel for a reason listed in Paragraph 3.a.(1) or 3.a.(2); or

(2) 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph 3.a.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

B. The following is added and supersedes any provisions to the contrary:

NONRENEWAL

1. Subject to the provisions of Paragraphs B.2. below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

2. We are not required to send notice of nonrenewal in the following situations:

   (a.) If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

   (b.) If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph B.1.

   (c.) If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

   (d.) If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

   (e.) If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

   (f.) If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph B.1, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

3. If we fail to give the timely notice required in Paragraph B.1., the policy shall be continued, with no change in terms or conditions, for a period of 60 days after we deliver said written notice.

**EXHIBIT B**

## NON PROFIT PROFESSIONAL LIABILITY POLICY
## RENEWAL CERTIFICATE
Please attach this Renewal Certificate to your expiring Policy.

# UNITED STATES LIABILITY
# INSURANCE COMPANY
## WAYNE, PENNSYLVANIA

In consideration of the renewal premium stated below, expiring Policy Number **NDO1017924C** is renewed for the Policy Period stated below. The Company will issue a complete copy of this Policy upon receipt of a written request from the Insured.

The New Policy Number is **NDO1017924D** .

The Application (if any) for this renewal, and all previous Applications made to the Company for this insurance, including any material submitted therewith, shall be made a part of this Renewal Policy as if physically attached hereto. PLEASE REFER TO YOUR POLICY FOR THE DEFINITION OF "APPLICATION."

**POLICY DECLARATIONS**

ITEM I.     PARENT ORGANIZATION AND PRINCIPAL
**Salinas Golf and Country Club**
**475 San Juan Grade Road**
**Salinas, CA 93906**

ITEM II.     POLICY PERIOD: (MM/DD/YYYY)
FROM  **11/26/2004** TO  **11/26/2005**

12:01 AM STANDARD TIME AT
YOUR MAILING ADDRESS SHOWN

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH LIMITS OF LIABILITY ARE INDICATED.

### Coverage Part A.  Non Profit Directors and Officers Liability

| | | | |
|---|---|---|---|
| ITEM III. | LIMITS OF LIABILITY: | **$1,000,000** | EACH CLAIM |
| | | **Not Covered** | FIDUCIARY LIABILITY LIMIT |
| | | **$1,000,000** | IN THE AGGREGATE |
| ITEM IV. | RETENTION: | **$10,000** | EACH CLAIM |
| ITEM V. | PREMIUM: | **$1,635** | |

### Coverage Part B.  Employment Practices Liability

| | | | |
|---|---|---|---|
| ITEM III. | LIMITS OF LIABILITY: | **$250,000** | EACH CLAIM |
| | | **$250,000** | IN THE AGGREGATE |
| ITEM IV. | RETENTION: | **$10,000** | EACH CLAIM |
| ITEM V. | PREMIUM: | **$383** | |

ITEM VI. Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:
DNOTIC (12-02) Discl. Notice of Terrorism Insurance Coverage        USL-DOJ (04-00) Policy Jacket
DO-100 (04-00) Coverage Part A
DO-101 (04-00) Coverage Part B
DO-263 (02-00) Deletion of Third Party Coverage Endt
DO-273 (04-02) Fair Labor Standards Act, Exclusion
DO-275 (11-02) Coverage Clarification Endt
DO-CA (02-01) California State Amendatory Endt
Endorsements in bold have been added to the policy or have a new edition date and are attached with this certificate.

Agent:  VENTURE PROGRAMS, INC.  [1208]
Date Issued:     12/1/2004

By  _Thomas P. Vierney_
Authorized Representative

USL-DOD CERT (11/97)

EXHIBIT B

# DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

THE POLICY TO WHICH THIS NOTICE IS ATTACHED DOES NOT CONTAIN A TERRORISM EXCLUSION.

HOWEVER, COVERAGE FOR "INSURED LOSSES" AS DEFINED IN THE TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED ("THE ACT") IS SUBJECT TO THE COVERAGE TERMS, CONDITIONS, AMOUNTS AND LIMITS IN THIS POLICY APPLICABLE TO LOSSES ARISING FROM EVENTS OTHER THAN ACTS OF TERRORISM. AS A RESULT, BECAUSE OF THE TERMS AND CONDITIONS OF THIS TYPE OF COVERAGE, THIS POLICY DOES NOT AFFORD ANY TERRORISM COVERAGE.

"INSURED LOSSES" AS DEFINED IN THE ACT ARE PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. UNDER THIS FORMULA, THE UNITED STATES PAYS 90% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE.

NO PREMIUM HAS BEEN CHARGED FOR TERRORISM COVERAGE AND NO PREMIUM HAS BEEN CHARGED FOR THE PORTION OF "INSURED LOSSES" THAT WOULD BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

# ENDORSEMENT

This Endorsement Modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY**

## DELETION OF THIRD PARTY COVERAGE ENDORSEMENT

In consideration of the premium paid for this Policy, it is agreed:

1.    Coverage Part B., Section III. Definitions, P. "**Third Party**", Q. "**Third Party Discrimination**", and R. "**Third Party Sexual Harassment**" are deleted in their entirety.

2.    Coverage Part B., Section III. Definitions, S. "**Wrongful Employment Act**" is amended by the deletion of (12) **Third Party Discrimination** and (13) **Third Party Sexual Harassment**.

All other terms and conditions of this Policy remain unchanged. This endorsement is a part of your Policy and takes effect on the effective date of your Policy, unless another effective date is shown below.

_____
Authorized Representative

DO-263 (2/00)

# UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

This Endorsement modifies insurance provided under the following:
### NON PROFIT DIRECTORS & OFFICERS LIABILITY
### AND EMPLOYMENT PRACTICES LIABILITY

### FAIR LABOR STANDARDS ACT, MISCLASSIFICATION OF STATUS
### AND MISREPRESENTATION OF STATUS EXCLUSION

In consideration of the premium charged, it is agreed that the following provision is added to DO-101 (04/00), Section IV, EXCLUSIONS:

L.    The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against any **Insured** for:

    (1) actual or alleged violations of the Fair Labor Standards Act (except the Equal Pay Act), any amendments thereto, or any similar provisions of any federal, state or local law; or

    (2) improper wages or wage disputes due to misclassification of **Employees** as exempt or non exempt; or

    (3) misrepresentation involving any **Employee's** status as exempt or non exempt.

All other terms and conditions of this Policy remain unchanged. This endorsement is a part of your Policy and takes effect on the effective date of your Policy unless another effective date is shown.

## UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

This Endorsement modifies insurance provided under the following:

## NON PROFIT DIRECTORS & OFFICERS LIABILITY
## EMPLOYMENT PRACTICES LIABILITY

## COVERAGE CLARIFICATION ENDORSEMENT

It is hereby agreed that **DO-101 (04/00)**, if applicable, Section IV, EXCLUSIONS, Paragraph F. is deleted in its entirety and replaced with the following:

F. any liability or costs incurred by any **Insured** to modify any buildings or property in order to make said building or property more accessible or accommodating to any disabled person:

It is further agreed that **DO-100 (04/00)**, Section IV, EXCLUSIONS, Paragraph F. is deleted in its entirety and replaced with the following:

F. any **Claims**, demands or actions seeking relief, or redress, in any form other than solely money damages, or any fees or expenses relating to **Claims**, demands or actions seeking relief or redress, in any form other than solely money damages:

It is further agreed that **DO-100 (4/00)**, Section IV, EXCLUSIONS, Paragraph I. is deleted in its entirety and replaced with the following:

I. any actual or alleged: refusal to employ: termination of employment: employment related coercion, demotion, evaluation, reassignment, discipline, workplace conditions, false imprisonment, defamation, harassment, humiliation, or discrimination of employment; other employment-related practices, policies, acts or omissions: or sexual harassment by an **Insured** against any person(s) or entity; or negligence involving any of the foregoing;

it being understood that this Exclusion applies whether the **Insured** may be held liable as an employer or in any other capacity and to any obligation to contribute with or indemnify another with respect to such **Claim**;

It is further agreed that **DO-100 (04/00)**, Section IV, EXCLUSIONS, Paragraph O. is added:

O. any **Claims** made against any **Insured** based upon, arising out of, or in any way involving any actual or alleged discrimination, including but not limited to discrimination based on religion, race, creed, color, sex, age, marital status, sexual preference, pregnancy, handicap or disability.

All other terms and conditions of this Policy remain unchanged. This endorsement is a part of your Policy and takes effect on the effective date of your Policy unless another effective date is shown.

DO-275 (11/02)                                                                 Page 1 of 1

# UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

This endorsement modifies insurance provided under the following
## NON PROFIT PROFESSIONAL LIABILITY

## CALIFORNIA STATE AMENDATORY ENDORSEMENT

**To be attached to and form a part of all Non Profit Professional Liability policies written in California.**

It is hereby understood and agreed that the following is added to COMMON POLICY CONDITIONS, Section III. CANCELLATION OR NON RENEWAL and supersedes any provisions to the contrary:

Subject to the provisions of paragraph 2. b. below, if the **Company** elects not to renew this Policy, it will mail or deliver written notice stating the reason for non-renewal to the first **Parent Organization** shown in the Declarations and to the producer of record, at least sixty (60) days, but not more than one hundred and twenty (120) days before the expiration or anniversary date. The **Company** will mail or deliver notice to the first **Parent Organization**, and to the producer of record, at the mailing address shown in the policy.

The **Company** is not required to send notice of non-renewal in the following situations:

  a.  If the transfer or renewal of a Policy, without any changes in terms, conditions, or rates, is between the **Company** and a member of the **Company's** Insurance Group.

  b.  If the Policy has been extended for ninety (90) days or less, provided that notice has been given in accordance with paragraph 1.

  c.  If the first **Parent Organization** has obtained replacement coverage, or has agreed in writing within sixty (60) days of the termination of the Policy, to obtain that coverage.

  d.  If the Policy is for a period of no more than sixty (60) days and the first **Parent Organization** is notified at the time of issuance that it will not be renewed.

  e.  If the first **Parent Organization** requests a change in the terms or conditions or risks covered by the Policy within sixty (60) days of the end of the **Policy Period**.

  f.  If the **Company** has made a written offer to the first **Parent Organization**, in accordance with the time frames shown in paragraph 1. to renew the Policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

All other terms and conditions of this Policy remain unchanged. This endorsement is a part of your Policy and takes effect on the effective date of your Policy, unless another effective date is shown.

COVERAGE PART A.  NON PROFIT DIRECTORS AND OFFICERS LIABILITY

NOTICE:  This is a **Claims Made Policy**.  This Policy only covers those **Claims** first made against the **Insured** during the **Policy Period** or Extension Period, if purchased.  **Defense Costs** shall be applied against the Retention.

In consideration of the payment of the premium and reliance upon all statements made and information furnished to the **Company**, including the statements made in the **Application** and all attachments and materials submitted therewith, and subject to all the provisions of this Policy, the **Company** agrees as follows:

I.  INSURING AGREEMENT
A.  The **Company** will pay on behalf of the **Insured** **Loss** excess of the Retention not exceeding the Limit of Liability for which this coverage applies that the **Insured** shall become legally obligated to pay because of **Claims** first made against the **Insured** during the **Policy Period** or during the Extension Period, if applicable, for **Wrongful Acts** arising solely out of an **Insured**'s duties on behalf of the **Organization**.

B.  The **Company** has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false, or fraudulent.  The **Company** may investigate any **Claim** and settle any **Claim** with the **Insured**'s consent as the **Company** deems expedient, but the **Company** is not obligated to pay any **Loss** or defend any **Claim** after the Limit of Liability has been exhausted by payments of **Loss**.

II.  FULL PRIOR ACTS COVERAGE PROVISION
Coverage shall apply to any **Claim** first made against the **Insured** for **Wrongful Acts** arising solely out of an **Insured's** duties on behalf of the **Organization** committed prior to the expiration date of this Policy, provided that the **Claim** is first made during the **Policy Period**, or the Extension Period, if applicable, and written notice of said **Claim** is reported to the **Company** as soon as practicable.  There shall be no coverage for any **Claim** reported to the **Company** later than 60 days after the end of the **Policy Period** or after the expiration of the Extension Period, if applicable.

However, coverage shall not apply to any **Claim** based upon or arising out of any **Wrongful Act** or circumstance likely to give rise to a **Claim** of which any **Insured** had knowledge, or otherwise had a reasonable basis to anticipate might result in a **Claim**, prior to the earlier of:

A.  the inception date of this Policy; or

B.  the inception date of the first Policy of this type the **Company** has issued to the **Parent Organization**, provided that the **Company** has written continuous coverage for the **Parent Organization** from such date to the inception date of this Policy.

III.  DEFINITIONS
A.  "**Application**" means:
(1) the Application for this Policy, a copy of which is attached hereto; and
(2) the Application(s), including any material herewith, for all previous policies issued by the **Company** providing continuous coverage until the inception date of this Policy together with any material submitted with the Application for this Policy, all of which shall be retained on file and deemed a part of this Policy as if physically attached hereto.

B. "Claim" means:

(1) any written notice received by any **Insured** that any person or entity intends to hold such **Insured** responsible for a **Wrongful Act**, or

(2) any judicial or administrative proceeding initiated against any **Insured** seeking to hold such **Insured** responsible for a **Wrongful Act**, including any appeal therefrom.

A **Claim** shall be considered first made when an **Insured** or its legal representative or agent first receives notice of the **Claim**.

C. "Company" means the insurer identified in the Declarations.

D. "Defense Costs" means reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend the **Insureds**, resulting from the investigation, adjustment, defense and appeal of a **Claim**. **Defense Costs** include fees, costs, costs of attachment or similar bonds (but without any obligation on the part of the **Company** to apply for or furnish such bonds), but does not include salaries, wages, overhead or benefits expenses of any **Insured**.

E. "Employee" means any person whose labor or service is engaged by and directed by the **Organization** and includes leased, part-time, seasonal and temporary employees, and volunteers. An **Employee's** status as an **Insured** will be determined as of the date of the **Wrongful Act** that results in a **Claim**.

F. "Individual Insureds" means any persons who were, now are, or shall be directors, trustees, officers, employees, volunteers or committee members of the **Organization**, including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

G. "Insured(s)" means the **Organization** and the Individual **Insureds**.

H. "Loss" means damages and settlements, but does not include fines, penalties imposed by law, sanctions, taxes, the multiplied portion of any multiple damage award, and matters deemed uninsurable under the law pursuant to which this Policy shall be construed. This definition does not exclude punitive damages unless such damages are uninsurable under applicable law.

I. "Organization" means:

(1) the **Parent Organization**; and

(2) any **Subsidiary** of the **Parent Organization**.

J. "Parent Organization" means the entity named in Item 1. of the Declarations.

K. "Policy Period" means the period from the effective date of this Policy to the Policy expiration date set forth in the Declarations, or its earlier cancellation or termination date, if any.

L. "Subsidiary" means any nonprofit entity, association or corporation of which the **Parent Organization** owns more than 50% of the voting stock, or in cases where no stock has been issued, controls such **Subsidiary** at the time of Policy inception, and shall be limited to any **Subsidiary** identified as such in the **Application**.

After the Inception Date of this Policy, **Subsidiary** shall also include any non profit entity whose assets total less than 25% of the total consolidated assets of the **Parent Organization** as of the inception date of this Policy, and which becomes a **Subsidiary** during the **Policy Period**. The **Parent Organization** shall provide the **Company** with full particulars of the new **Subsidiary** as soon as practicable, but no later than the expiration of this Policy.

An entity which becomes a **Subsidiary** during the **Policy Period** whose assets total 25% or more of the total consolidated assets of the **Parent Organization** as of the inception date of this Policy shall be covered as a **Subsidiary** only if:

(1) the **Parent Organization** provides written notice to the **Company** of such **Subsidiary** as soon as practicable, but within 60 days of the entity becoming a **Subsidiary**;
(2) the **Parent Organization** provides the **Company** with such information as the **Company** may deem necessary;
(3) the **Parent Organization** accepts any special terms, conditions, exclusions or additional premium charge as may be required; and
(4) the **Company**, at its sole discretion, agrees to provide such coverage.

A **Subsidiary** which is sold or dissolved:

(1) after the inception date of this Policy and which was an **Insured** under this Policy; or
(2) prior to the inception date of this Policy and which was an **Insured** under a prior Policy issued by the **Company**;

shall continue to be an **Insured**, but only with respect to **Claims** first made during the **Policy Period** or Extension Period, if applicable, arising out of **Wrongful Acts** committed or allegedly committed during the time that the entity was a **Subsidiary** of the **Parent Organization**.


M.   "**Wrongful Act**" means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duties:

(1) by the **Organization** or by the **Individual Insureds** arising solely from their capacity with the **Organization**; or
(2) asserted against the **Individual Insureds** because of their status as such.

It is further agreed that the same **Wrongful Act**, and interrelated series of **Wrongful Acts** or a series of similar or related **Wrongful Acts** by one or more **Insureds** shall be deemed to be one **Wrongful Act** and to have commenced at the time of the earliest **Wrongful Act**.


IV.  EXCLUSIONS
The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against any **Insured** arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

A.  any actual or alleged bodily injury, sickness, humiliation, mental anguish, emotional distress, assault, battery, disease or death of any person, or damage to or destruction of any tangible property including any resulting loss of use;  provided that this exclusion shall not apply to Claims for libel, slander or

defamation that result from a Wrongful Act. However, coverage afforded for libel, slander or defamation shall be excess of the **Insured's** General Liability Policy;

B. brought about or contributed to in fact by any dishonest, fraudulent or criminal **Wrongful Act** or by any **Wrongful Act** committed with intent to cause damage;

C. any of the **Insureds** gaining in fact any profit, remuneration or advantage to which such **Insured** was not legally entitled;

D. the actual, alleged or threatened discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, noise, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, whether or not such actual, alleged or threatened discharge, dispersal, release or escape is sudden, accidental or gradual in nature, or any cost or expense arising out of any request, demand, or order that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

E. any radioactive, toxic or explosive properties of nuclear material which includes, but is not limited to, source material, "special nuclear material", and "by product material" as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions by any federal, state or local statutory or common law;

F. that portion of any **Claim**, demand or action seeking relief or redress in any form other than money damages provided that this exclusion will not apply to **Defense Costs** for such a **Claim**;

G. any pension, profit sharing, welfare benefit or other employee benefit program established in whole or part for the benefit of any **Individual Insured**, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (or any amendments thereof or regulations promulgated thereunder) or similar provisions of any federal, state or local statutory law or common law.

H. any **Claim** by, at the behest of, or on behalf of the **Organization** and/or any **Individual Insured**; provided that this Exclusion shall not apply to:

(1) any derivative action on behalf of, or in the name or right of the **Organization**, if such action is brought and maintained totally independent of, and without the solicitation, assistance, participation or intervention of, any of the **Insureds**; or

(2) a **Claim** that is brought and maintained by or on behalf of any **Individual Insured** for contribution or indemnity which is part of or results directly from a **Claim** which is otherwise covered by the terms of this Policy;

I. any actual or alleged: refusal to employ; termination of employment; employment related coercion, demotion, evaluation, reassignment, discipline, workplace conditions, false imprisonment, defamation, harassment, humiliation, or discrimination of employment; other employment-related practices, policies, acts or omissions; or discrimination or sexual harassment by an **Insured** against any person(s) or entity; or negligence involving any of the foregoing;

it being understood that this Exclusion applies whether the **Insured** may be held liable as an employer or in any other capacity and to any obligation to contribute with or indemnify another with respect to such **Claim**;

J. any actual or alleged breach of contract;

K. any pending or prior litigation, administrative or regulatory proceeding, claim, demand, arbitration, decree, or judgment of which an **Insured** had written notice before the inception date of this Policy; or any fact, circumstance, event, situation, or **Wrongful Act** which before the inception date of this Policy was the subject of any notice under any other similar policy of insurance; or any future **Claims** or litigation based upon the pending or prior litigation or derived from the same or essentially the same facts, actual or alleged;

provided that, if this Policy is a renewal of a policy or policies previously issued by the **Company** and if the coverage provided by the **Company** was continuous from the inception date of the first such other policy to the inception date of this Policy, the reference in this exclusion will mean the inception date of the first Policy under which the **Company** began to provide continuous coverage to the **Insured**;

L. the rendering or failure to render medical, psychological or counseling services or referrals

M. any **Claim** against any **Subsidiary** or its Insured Persons for any **Wrongful Act** occurring prior to the date that such entity became a **Subsidiary** or any **Wrongful Act** occurring at any time that such entity is not a **Subsidiary**; or

N. the portion of any **Claim** covered under any other Coverage Part of this Policy.

No **Wrongful Act** of any **Individual Insured** nor any fact pertaining to any **Insured** shall be imputed to any other **Individual Insured** for purposes of determining the applicability of exclusions B. and C.

## V. LIMITS OF LIABILITY AND RETENTION
Regardless of the number of **Insureds** under this Policy, **Claims** made or brought on account of **Wrongful Acts** or otherwise, the **Company's** liability is limited as follows:

A. the Limit of Liability specified in the Declarations as annual aggregate shall be the maximum liability for **Loss** from all **Claims** to which this Coverage Part applies;

B. the Limit of Liability specified in the Declarations as the Limit for each **Claim** shall be the maximum liability for **Loss** for each **Claim** to which this Coverage Part applies;

C. **Defense Costs** shall be in addition to the Limit of Liability as shown in the Declarations, except for when Item G. below applies;

D. subject to the Limits of Liability provisions stated above, the **Company** shall be liable to pay only **Loss** in excess of the Retention specified in the Declarations hereof as respects each and every **Claim** to which the Coverage Part applies.

E. the **Company** shall have no obligation to pay any part or all of the Retention specified in the Declarations for any **Claim** on behalf of any **Insured**. If the **Company**, at its sole discretion, elects to pay any part or all of the Retention, the **Insureds** agree to repay such amounts to the **Company** upon demand;

F. the Retention shall not apply to **Loss** paid to or on behalf of an **Individual Insured** when the **Organization** has not paid **Loss** to or on behalf of an **Individual Insured** as indemnification subject to the terms and conditions of Section VIII. Presumption of Indemnification/ Deletion of Retention;

G. the Limit of Liability for the Extension Period, if applicable, shall be a part of and not in addition to the limit specified in the Declarations;

H. **Claims** based upon or arising out of the same **Wrongful Act**, interrelated **Wrongful Acts**, or a series of similar or related **Wrongful Acts** shall be considered a single **Claim** and shall be considered first made during the **Policy Period** or Extension Period, if applicable, in which the earliest **Claim** arising out of such **Wrongful Act**(s) was first made and all **Defense Costs** and **Loss** for such **Claims** shall be subject to the one Limit of Liability that applies to such earliest **Claim**;

I. the Limit of Liability for this Coverage Part shall apply separately to each consecutive annual period starting with the beginning of the **Policy Period** shown in the Declarations. If this Policy is issued for a period of more than twelve (12) months but less than twenty four (24) months or if the **Policy Period** is extended after issuance, the additional period will be deemed part of the last preceding annual period for the purposes of determining the Limit of Liability.

## VI. UNLIMITED REPORTING PERIOD FOR FORMER DIRECTORS AND OFFICERS

If the **Parent Organization** shall cancel or non-renew this Policy for a reason other than being sold, acquired or bankrupt, each Director or Officer that was an **Insured**, but who did not serve as a Director or Officer at the time of the cancellation or non-renewal, shall be provided an unlimited extension of coverage granted by this Policy to report any **Claim**(s) first made against the Director or Officer after the date of such cancellation or non-renewal.

However, this extension of coverage shall only be afforded in the event that the **Wrongful Act** was committed before the date of cancellation or non-renewal, and no Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or extension period, is in effect at the time the **Claim** is made.

## VII. EXTENSION PERIOD

A. If the Company or the **Parent Organization** declines to renew or non-renews this Policy or if the **Parent Organization** cancels this Policy for reason other than non payment of premium, the **Parent Organization** shall have the right to purchase an extension of coverage granted by this Policy to report any **Claim**(s) first made against the **Insured** during the twelve (12) months, or twenty-four (24) months or thirty-six (36) months after the date of such cancellation or non-renewal (depending upon the Extension Period purchased), but only in respect of any **Wrongful Act** committed before the date of such cancellation or non-renewal.

The additional premium for the Extension Period shall be 30% of the annual premium set forth in the Declarations for the twelve (12) month period, 75% of the annual premium set forth in the Declarations for the twenty-four (24) month period, and 120% of the annual premium set forth in the Declarations for the thirty-six (36) month period. The Extension Period begins on the termination date of the Policy. The **Parent Organization** must notify the **Company** in writing and must pay the additional premium set forth above no later than thirty (30) days after the effective date of such cancellation or non-renewal.

DO-100 (4/00)

B. All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this clause, any change in premium terms or terms on renewal shall not constitute a refusal to renew.

C. The Limits of Liability available during the Extension Period shall not exceed the balance of the Limits of Liability in effect at the time the Policy is terminated.

D. Coverage for **Claim**(s) first received and reported during the Extension Period shall be in excess over any other valid and collectible insurance providing substantially the same coverage as this Policy.

## VIII. PRESUMPTION OF INDEMNIFICATION / DELETION OF RETENTION

Regardless of whether **Loss** resulting from any **Claim** against an **Individual Insured** is actually indemnified, the Retention set forth in the Declarations shall apply to any **Loss** if indemnification by the **Organization** is legally permissible. The certificate of incorporation, charter, articles of association or other organizational documents of the **Organization**, including bylaws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Individual Insured** to the fullest extent permitted by law.

However, if and **Individual Insured** is not indemnified for **Loss** solely by reason of the **Organization's** financial insolvency or because indemnification is not legally permissible, an **Individual Insured's** Retention as stated on the Declarations for Coverage Part A. Non Profit Directors and Officers Liability, shall be amended to $0. This change in Retention shall not affect any other terms or conditions of this Policy.

## IX. SPOUSAL EXTENSION

If a **Claim** against an **Individual Insured** includes a **Claim** against the lawful spouse of such **Individual Insured** solely by reason of (1) such spousal status, or (2) such spouse's ownership interest in property or assets that are sought as recovery for **Wrongful Acts**, any **Loss** which such spouse becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Individual Insured** becomes legally obligated to pay as a result of the **Claim**.

All definitions, exclusions, terms and conditions of this Policy, including the Retention, applicable to any **Claim** against or **Loss** sustained by such **Individual Insured** shall also apply to such spousal **Claim** or **Loss**.

The extension of coverage afforded by this Section IX. shall not apply to the extent the **Claim** alleges any wrongful act, error, omission, misstatement, misleading statement or neglect or breach of duties by such spouse.

COVERAGE PART B. EMPLOYMENT PRACTICES LIABILITY

NOTICE: This is a Claims Made Policy. This Policy only covers those Claims first made against the Insured during the Policy Period or Extension Period, if purchased. Defense costs shall be applied against the Retention.

In consideration of the payment of the premium and reliance upon all statements made and information furnished to the Company, including the statements made in the Application and all attachments and materials submitted therewith, and subject to all the provisions of this Policy, the Company agrees as follows:

I. INSURING AGREEMENT
A. The Company will pay on behalf of the Insured Loss excess of the Retention not exceeding the Limit of Liability for which this coverage applies that the Insured shall become legally obligated to pay because of Claims first made against the Insured during the Policy Period or during any Extension Period, if applicable, for Wrongful Employment Acts arising solely out of an Insured's duties on behalf of the Organization.

B. The Company has the right and duty to defend any Claim to which this insurance applies, even if the allegations of the Claim are groundless, false, or fraudulent. The Company may investigate any Claim and settle any Claim with the Insured's consent as the Company deems expedient, but the Company is not obligated to pay any Loss or defend any Claim after the Limit of Liability has been exhausted by payments of Loss.

II. FULL PRIOR ACTS COVERAGE PROVISION
Coverage shall apply to any Claim first made against the Insured for Wrongful Employment Acts arising solely out of an Insured's duties on behalf of the Organization committed prior to the expiration date of this Policy, provided that the Claim is first made during the Policy Period, or the Extension Period, if applicable, and written notice of said Claim is reported to the Company as soon as practicable. There shall be no coverage for any Claim reported to the Company later than sixty (60) days after the end of the Policy Period or after the expiration of the Extension Period, if applicable.

However, coverage shall not apply to any Claim based upon or arising out of any Wrongful Employment Act or circumstance likely to give rise to a Claim of which any Insured had knowledge or otherwise had a reasonable basis to anticipate might result in a Claim, prior to the earlier of:

A. the inception date of this Policy; or

B. the inception date of the first Policy of this type the Company has issued to the Parent Organization, provided that the Company has written continuous coverage for the Parent Organization from such date to the inception date of this Policy.

III. DEFINITIONS
A. "Application" means:
(1) the Application for this Policy, a copy of which is attached hereto; and

(2) the Application(s), including any material herewith, for all previous policies issued by the Company providing continuous coverage until the inception date of this Policy together with any material

submitted with the Application for this Policy. all of which shall be retained on file and deemed a part of this Policy as if physically attached hereto.

B. "Claim" means:
(1) any written notice received by any **Insured** that any person or entity intends to hold such **Insured** responsible for a **Wrongful Employment Act**. or
(2) any judicial or administrative proceeding initiated against any **Insured** seeking to hold such **Insured** responsible for a **Wrongful Employment Act**. including any proceeding conducted by the Equal Employment Opportunity Commission or similar federal. state or local agency and any appeal therefrom.

A **Claim** shall be considered first made when an **Insured** or its legal representative or agent first receives notice of a **Claim**.

C. "**Company**" means the insurer identified in the Declarations.

D. "Defense costs" means reasonable and necessary legal fees and expenses incurred by the **Company**, or any attorney designated by the **Company** to defend the **Insureds**, resulting from the investigation, adjustment. defense and appeal of a **Claim**. **Defense Costs** include other fees, costs, costs of attachment or similar bonds (without any obligation on the part of the **Company** to apply for or furnish such bonds.) but does not mean salaries, wages. overhead or benefits expenses of any **Insured**.

E. "**Discrimination**" means:
(1) the termination of an employment relationship;
(2) a demotion or failure to hire or promote any individual; or
(3) any other limitation or classification of an **Employee** or applicant for employment which would deprive any individual of employment opportunities or adversely affect any individual's status as an **Employee**;

because of race, color, religion, age. sex. disability, pregnancy. national origin. marital status, sexual orientation or other protected class or characteristic established under applicable federal. state. or local statute or ordinance. regulation or order.

F. "**Employee**" means any person whose labor or service is engaged by and directed by the **Organization** and includes leased. part-time. seasonal and temporary workers and volunteers. An **Employee's** status as an Insured will be determined as of the date of the **Wrongful Employment Act** which results in the **Claim**.

G. "**Harassment**" means:
(1) sexual harassment including unwelcome sexual advances. requests for sexual favors or other verbal or physical conduct of a sexual nature that are made a condition of employment, are used as a basis for employment decisions. or create a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance; or
(2) other workplace harassment which creates a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance.

H. "**Individual Insureds**" means any persons who were, now are, or shall be directors, trustees. officers. employees. volunteers or committee members of the **Organization**. including their estates. heirs, legal representatives or assigns in the event of their death. incapacity or bankruptcy.

I. "Insured(s)" means the **Organization** and the **Individual Insureds**.

J. "Loss" means damages and settlements, but does not include fines, penalties imposed by law, sanctions, taxes and matters deemed uninsurable under the law pursuant to which this Policy shall be construed. This definition does not exclude punitive damages or exemplary damages or the multiplied portion of any multiple damage award unless such damages are uninsurable under applicable law.

K. "Organization" means:
(1) the **Parent Organization**; and
(2) any **Subsidiary** of the **Parent Organization**.

L. "Parent Organization" means the entity named in Item 1. of the Declarations.

M. "Policy Period" means the period from the effective date of this Policy to the Policy expiration date set forth in the Declarations, or its earlier cancellation or termination date, if any.

N. "Retaliation" means any actual or alleged retaliatory treatment against an **Employee** because of:

(1) the exercise of or attempt to exercise an **Employee's** rights under law;
(2) an **Employee's** disclosure of or threat to disclose to a governmental agency or superior acts of actual or alleged wrongdoing by any **Insured**;
(3) the filing of any claim under any federal, state or local "whistle-blower" law including the Federal False Claims Act; or
(4) **Employee** strikes or slowdowns.

O. "Subsidiary" means any nonprofit entity, association or corporation, of which the **Parent Organization** owns more than 50% of the voting stock, or in cases where no stock has been issued, controls such **Subsidiary** at the time of Policy inception, and shall be limited to any **Subsidiary** identified as such in the **Application**.

After the Inception Date of this Policy, **Subsidiary** shall also include any non profit entity whose assets total less than 25% of the total consolidated assets of the **Parent Organization** as of the inception date of this Policy, and which becomes a **Subsidiary** during the **Policy Period**. The **Parent Organization** shall provide the **Company** with full particulars of the new **Subsidiary** as soon as practicable, but no later than the expiration of this Policy.

An entity which becomes a **Subsidiary** during the **Policy Period** whose assets total 25% or more of the total consolidated assets of the **Parent Organization** as of the inception date of this Policy shall be covered as a **Subsidiary** only if:

(1) the **Parent Organization** provides written notice to the **Company** of such **Subsidiary** as soon as practicable, but within 60 days of the entity becoming a **Subsidiary**;
(2) the **Parent Organization** provides the **Company** with such information as the **Company** may deem necessary;
(3) the **Parent Organization** accepts any special terms, conditions, exclusions or additional premium charge as may be required; and
(4) the **Company**, at its sole discretion, agrees to provide such coverage.

A **Subsidiary** which is sold or dissolved:

(1) after the inception date of this Policy and which was an **Insured** under this Policy; or
(2) prior to the inception date of this Policy and which was an **Insured** under a prior Policy issued by the **Company**;

shall continue to be an **Insured**, but only with respect to **Claims** first made during the **Policy Period** or Extension Period, if applicable, arising out of **Wrongful Acts** committed or allegedly committed during the time that the entity was a **Subsidiary** of the **Parent Organization**.

P. "**Third Party**" means any person(s) with whom an Insured in their capacity as such interacts

Q. "**Third Party Discrimination**" means discrimination by an Insured in their capacity as such against a Third Party based upon such Third Party's race, religion, age, sex, disability, national origin, sexual orientation or other protected class or characteristic established under applicable federal, state or local statute or ordinance.

R. "**Third Party Sexual Harassment**" means any unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature that is made by an Insured in their capacity as such against a Third Party.

S. "**Wrongful employment act**" means any actual or alleged act of:
(1) **Discrimination**;
(2) **Harassment**;
(3) **Retaliation**;
(4) **Wrongful Termination**;
(5) employment related misrepresentation
(6) negligent evaluation, training or supervision of **Employees**;
(7) failure to enforce adequate policies and procedures relating to any **Wrongful Employment Act**;
(8) wrongful discipline
(9) wrongful deprivation of career opportunity
(10) negligent violation of the Family Leave Act of 1993;
(11) acts described in clauses (1) through (10) above arising from the use of the **Organization's** Internet, e-mail, telecommunication or similar systems, including the failure to provide and enforce adequate policies and procedures relating to such use of the **Organization's** Internet, e-mail, telecommunication or similar systems;

committed or allegedly committed by the **Organization** or by an **Individual Insured** acting solely within his/her capacity as such involving any **Employee**, former **Employee** or applicant for employment with the **Organization**; or asserted against any **Insured** because of his/her status as such.

**Wrongful Employment Act** shall also include any actual or alleged act of:

(12) **Third Party Discrimination**
(13) **Third Party Sexual Harassment**

It is further agreed that the same **Wrongful Employment Act**, and interrelated series of **Wrongful Employment Acts** or a series of similar or related **Wrongful Employment Acts** by one or more

DO-101 (4/00)

Insured shall be deemed to be one **Wrongful Employment Act** and to have commenced at the time of the earliest **Wrongful Employment Act**.

T.    "**Wrongful Termination**" means the actual or constructive termination of an employment relationship or the demotion of or the failure to promote any **Employee** in a manner which is illegal and wrongful or in breach of an implied agreement to continue employment. **Wrongful Termination** shall not include a termination which is or is alleged to be in breach or violation of an express contract of employment or an express obligation to make payments in the event of the termination of employment.

## IV. EXCLUSIONS

The **Company** shall not be liable to make payment for **Loss** or **Defense costs** in connection with any **Claim** made against any **Insured** arising out of, directly or indirectly resulting from or in consequence of or in any way involving:

A.    any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property including any resulting loss of use; provided that this exclusion shall not apply to **Claims** for mental anguish, emotional distress, invasion of privacy, or humiliation, libel, slander or defamation that result from a **Wrongful Employment Act**;

B.    conduct of the **Insured** or at the **Insured's** direction that is fraudulent, dishonest or criminal provided that this exclusion will not apply to: (1) **Defense Costs** incurred until such conduct is proven in fact to be fraudulent, dishonest or criminal; or (2) to the strictly vicarious liability of any **Insured** for the fraudulent, dishonest or criminal conduct of another **Insured**;

C.    any pension, profit sharing, welfare benefit or other employee benefit program established in whole or in part for the benefit of any **Individual Insured**, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (or any amendments thereof or regulations promulgated thereunder) or similar provisions of any federal, state or local statutory law or common law;

D.    any obligation under a worker's compensation, disability benefits, insurance benefits or unemployment compensation law, or any similar law; provided this exclusion will not apply to any **Claim** for actual or alleged **Retaliation**;

E.    any pending or prior litigation or administrative or regulatory proceeding of which an **Insured** had written notice before the inception date of this Policy; any fact, circumstance, event, situation, or **Wrongful Employment Act** which before the inception date of this Policy was the subject of any notice under any other similar policy of insurance; or any future **Claims** or litigation based upon the pending or prior litigation or derived from the same or essentially the same facts, actual or alleged;

provided that, if this Policy is a renewal of a policy or policies previously issued by the **Company** and if the coverage provided by the **Company** was continuous from the inception date of the first such other policy to the inception date of this Policy, the reference in this Exclusion will mean the inception date of the first Policy under which the **Company** began to provide continuous coverage to the **Insured**;

F.    any liability or costs incurred by any **Insured** to modify any buildings or property in order to make said building or property more accessible to provide continuous coverage to the **Insured**;

G. any lockout, strike, picket line, replacement of worker(s) or other similar actions resulting from labor disputes or labor negotiations; provided that this Exclusion will not apply to a **Claim** for actual or alleged **Retaliation**;

H. any **Claim** against any **Subsidiary** or its Insured Persons for any **Wrongful Act** occurring prior to the date that such entity became a **Subsidiary** or any **Wrongful Act** occurring at any time that such entity is not a **Subsidiary**; or

I. the National Labor Relations Act, Labor Management Relations Act and amendments thereto, or any similar state, federal, or local law; provided that this Exclusion will not apply to a **Claim** for actual or alleged **Retaliation**;

J. the portion of any **Claim** covered under any other Coverage Part of this Policy; or

K. any **Insured's** actual or alleged liability for damages under any express contract or agreement; provided that this exclusion does not apply to liability for a **Wrongful Employment Act** which an **Insured** would have in the absence of the contract or agreement.

## V. LIMITS OF LIABILITY AND RETENTION

Regardless of the number of **Insureds** under this Policy, **Claims** made or brought on account of **Wrongful Acts** or otherwise, the **Company's** liability is limited as follows:

A. the Limit of Liability specified in the Declarations hereof as annual aggregate shall be the maximum liability for **Loss** from all **Claims** to which this Coverage Part applies;

B. the Limit of Liability specified in the Declarations as the Limit for each **Claim** shall be the maximum liability for **Loss** for each **Claim** to which this Coverage Part applies;

C. **Defense costs** shall be in addition to the Limit of Liability as shown in the Declarations, except for when Item F. below applies;

D. subject to the Limits of Liability provisions stated above, the **Company** shall be liable to pay only **Loss** in excess of the Retention specified in the Declarations hereof as respects each and every **Claim** to which this Coverage Part applies.

E. the **Company** shall have no obligation to pay any part or all of the Retention specified in the Declarations for any **Claim** on behalf of any **Insured**. If the **Company**, at its sole discretion, elects to pay any part or all of the Retention, the **Insureds** agree to repay such amounts to the **Company** upon demand;

F. the Limit of Liability for the Extension Period, if applicable, shall be a part of and not in addition to the limit specified in the Declarations;

G. **Claims** based upon or arising out of the same **Wrongful Employment Act**, interrelated **Wrongful Employment Acts**, or a series of similar or related **Wrongful Employment Acts** shall be considered a single **Claim** and shall be considered first made during the **Policy Period** or Extension Period in which the earliest **Claim** arising out of such **Wrongful Employment Act(s)** was first made and all **Defense costs** and **Loss** for such **Claims** shall be subject to the one Limit of Liability that applies to such earliest **Claim**;

H. the Limit of Liability for this Coverage Part shall apply separately to each consecutive annual period starting with the beginning of the **Policy Period** shown in the Declarations. If this Policy is issued for a period of more than twelve (12) months but less than twenty four (24) months or if the **Policy Period** is extended after issuance, the additional period will be deemed part of the last preceding annual period for the purposes of determining the Limit of Liability.

## VI. UNLIMITED REPORTING PERIOD FOR FORMER DIRECTORS AND OFFICERS

If the **Parent Organization** shall cancel or non-renew this Policy, each Director or Officer that was an **Insured**, but who did not serve as a Director or Officer at the time of the cancellation or non-renewal, shall be provided an unlimited extension of coverage granted by this Policy to report any **Claim(s)** first made against the Director or Officer after the date of such cancellation or non-renewal.

However, this extension of coverage shall only be afforded in the event that the **Wrongful Employment Act** was committed before the date of cancellation or non-renewal, and no Directors and Officers Liability policy (or policy providing essentially the same type of coverage) or extension period is in effect at the time the **Claim** is made.

## VII. EXTENSION PERIOD

A. If the **Company** or the **Parent Organization** declines to renew or non-renew this Policy or if the **Parent Organization** cancels this Policy for reason other than non payment of premium, the **Parent Organization** shall have the right to purchase an extension of coverage granted by this Policy to report any **Claim(s)** first made against the **Insured** during the twelve (12) months, or twenty-four (24) months or thirty-six (36) months after the date of such cancellation or non-renewal (dependent upon the number of months the Extension Period is purchased), but only in respect of any **Wrongful Employment Act** committed before the date of such cancellation or non-renewal.

The additional premium for the Extension Period shall be 30% of the annual premium set forth in the Declarations for the twelve (12) month period, 75% of the annual premium set forth in the Declarations for the twenty-four (24) month period, and 120% of the annual premium set forth in the Declarations for the thirty-six (36) month period. The number of months purchased for the Extension Period shall start on the termination date of the Policy. The **Parent Organization** must notify the **Company** in writing and must pay the additional premium set forth above no later than thirty (30) days after the effective date of such cancellation or non-renewal.

B. All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this clause, any change in premium terms or terms on renewal shall not constitute a refusal to renew.

C. The Limits of Liability available during the Extension Period shall not exceed the balance of the Limits of Liability in effect at the time the Policy is terminated.

D. Coverage for **Claim(s)** first received and reported during the Extension Period shall be in excess over any other valid and collectible insurance providing substantially the same coverage as this Policy.

## VIII. SPOUSAL EXTENSION

If a **Claim** against an **Individual Insured** includes a Claim against the lawful spouse of such **Individual Insured** solely by reason of (a) such spousal status, or (b) such spouse's ownership interest in property or assets that are sought as recovery for **Wrongful Employment Acts**, any **Loss** which such spouse

becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Individual Insured** becomes legally obligated to pay as a result of the **Claim.**

All definitions. exclusions, terms and conditions of this Policy. including the Retention. applicable to any **Claim** against or **Loss** sustained by such **Individual Insured** shall also apply to such spousal **Claim** or **Loss.**

The extension of coverage afforded by  this Section VIII. shall not apply to the extent the **Claim** alleges any wrongful act, error, omission, misstatement, misleading statement or neglect or breach of duties by such spouse.